## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **AMBIMJB, LLC** | * | |
| **Plaintiff** | * | |
| **v.** | * | **Case No.: 1:20-cv-00807-JKB** |
| **STRATEGIC ARMORY CORPS, LLC,** | * | |
| **Defendant** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DEFENDANT STRATEGIC ARMORY CORPS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF <u>CROSS-MOTION FOR SUMMARY JUDGMENT</u>

Date: November 5, 2020

Respectfully submitted,

/s/ Steven E. Tiller
Steven E. Tiller (Bar No. 11085)
Timothy R. Willman (Bar No. 21088)
Whiteford, Taylor & Preston, LLP
Seven Saint Paul Street, Suite 1500
Baltimore, Maryland 21202-1636
stiller@wtplaw.com
twillman@wtplaw.com
(410) 347-9425
(410) 223-4325

*Attorneys for Strategic Armory Corp LLC*

i

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

FACTS ...................................................................................................................2

    *a. The Parties and Their Initial Relationship* ............................................2
    *b. The Patent* ..........................................................................................2
    *c. Pre-Agreement Dealings and Intentions* ..............................................4
    *d. The Agreement* ...................................................................................6
    *e. The Purpose of the Agreement was Frustrated* ....................................7
    *f. Invalidity of the Patent* .......................................................................9

STANDARD OF REVIEW .....................................................................................11

ARGUMENT ........................................................................................................11

I.    **A Genuine Dispute of Material Fact Exists Regarding the Agreement and its Purpose** ...............................................................11

    *a. The Agreement Encompassed More Than What was Written* ..............13

II.    **There are Genuine Disputes of Fact Regarding Each of SAC's Counterclaims so Summary Judgment is Not Warranted** ...................14

    *a. Summary Judgment is not Warranted on SAC's Failure of Consideration Counterclaim* .................................................................14

    *b. Summary Judgment is not Warranted on SAC's Implied Warranty of Fitness for a Particular Purpose Counterclaim* ...............................17

    *c. Summary Judgment is Not Warranted on SAC's Frustration of Purpose Counterclaim* ......................................................................18

    *d. Summary judgment is Not Warranted on SAC's Mistake Counterclaims* ...................................................................................20

        *i. Mutual Mistake* ...........................................................................20

        *ii. Unilateral Mistake* .......................................................................21

III.    **SAC is entitled to summary judgment on Count II (Unjust Enrichment)** ...........................................................................22

    *a. AMBI never charged or intended to charge SAC for its consulting services* ........23

*b.*   SAC was not *unjustly* enriched .............................................................................24

<u>CONCLUSION</u>....................................................................................................................25

## I.     INTRODUCTION

Plaintiff AMBIMJB, LLC ("AMBI") paints this case as a simple contract dispute whereby SAC is attempting to avoid its payment obligations "through a myriad of inherently contradictory positons that are devoid of both factual and legal support."   Notwithstanding this gross mischaracterization, this disagreement is anything but simple and Defendant Strategic Armory Corps, LLC's ("SAC") positions are anything but contradictory or baseless.   While the underlying agreement drafted by AMBI on which this suit is predicated is a mere one and one-half pages with only five enumerated paragraphs calling for the assignment of a patent purportedly owned by AMBI to SAC in return for payment, the evidence, testimony, and record reveal a much more nuanced transaction.   Indeed, if the transaction was as simple as AMBI attempts to portray it, why would SAC agree to pay $2.5 million dollars for *only* the assignment of a patent, which it could not manufacture and incorporate into its rifles?   AMBI's attempts to oversimplify this dispute fail to get around the fact that there are genuine and significant disputes of material facts underlying its claims.

What is clear, however, is that there are no disputes of material facts that AMBI is not entitled to the approximately $220,000.00 in consulting fees it seeks under the guise of an unjust enrichment claim.   There is simply no dispute that AMBI never charged, nor did it ever intend to charge, SAC for engineering services provided by AMBI's president.   As such, AMBI's attempt to now seek payment for these services fails as a matter of law, and SAC is entitled to summary judgment on Count II of AMBI's Complaint.

## II.     FACTS

*a.   The Parties and Their Initial Relationship*

1

AMBI designs, develops, manufactures, and creates engineering solutions for firearms and firearm accessories.  ECF 7 at ¶ 2. On the other hand, SAC designs, manufactures, and sells firearms and related components.  *Id.* at ¶ 1.  Clients of SAC include police forces and national militaries.  Schincariol Deposition Transcript, attached hereto as **Exhibit 1**, at 128:19 – 20; 163:3 – 6.

The parties initially connected through SAC's former CEO, Jason Kalua ("Mr. Kalua").[1] SAC's owner, Jose Schincariol ("Mr. Schincariol"), informed Mr. Kalua that SAC was interested in acquiring the rights to a gas piston system to incorporate onto its rifles for large-scale distribution and tasked Mr. Kalua with achieving this goal.[2]  Ex. 2, at 45:20 – 46:7.  Mr. Kalua knew AMBI's President, Michael Brown ("Mr. Brown"), through prior business dealings, *Id.* at 25:17 – 26:4, and reached out to him in April 2018 to inquire if AMBI owned rights to a gas piston system it may be willing to sell, to which Mr. Brown replied "yes."  *Id.* at 48:15 – 50:9.   As it turned out, AMBI was the owner of a patent that appeared to be the type of gas piston system SAC was seeking.

   *b.  The Patent*

In this regard, AMBI was the identified owner of United States Patent No. 9,816,769 (the "Patent") issued November 14, 2017.  ECF 43-4.  The Patent claims a gas piston system that allows

---

[1]      Mr. Kalua was employed by SAC as CEO from May 2018 through May 2019.  Kalua Deposition Transcript, attached hereto as **Exhibit 2**, at 38:3 – 6.  Prior to Mr. Kalua's full-time employment at SAC, he performed consulting work for SAC.  *Id.* at 45:20 – 46:11.

[2]      There are references to other companies, including Armalite and Surgeon, throughout the deposition transcripts in this case.  SAC acquires and combines companies within the firearms industry "to form a strong base of products and services … designed to meet the expectations of military, law enforcement, commercial groups, and individual users around the world."  https://www.sacfirearms.com/.  Armalite and Surgeon are companies owned and operated by SAC.  Thus, references to Armalite and Surgeon rifles are synonymous with SAC rifles.

excess gas pressure to be vented in a forward direction away from the operator's face and hands.

*Id.*, at 1:5-10.[3]  Claim 1 is illustrative of the Patent's claims:

    1.   A firearm gas operating system, comprising:

    a barrel having an axial bore and a gas port;

    a gas block on the barrel having a gas block passageway operatively connected with the gas port, the gas block including a cylinder housing extending axially substantially parallel to the barrel bore and open at forward and rear ends;

    a gas actuation piston insertable through the open forward end of the cylinder housing to operably reciprocate in the cylinder housing between a forward at rest position and a rearward actuated position, the piston having a head portion with a recess including an open forward end and closed rearward end;

    a switchable gas control valve insertable into the open forward end of the cylinder housing, the valve including a central passageway open at forward and rear ends, a plurality of separate gas flow control orifices selectively positioned to control gas flow from the gas block passageway to an interior chamber in the cylinder housing defined between the control valve and gas actuation piston; and

    a tubular extension open at opposite ends and axially extending rearward from the gas control valve, the tubular extension being configured to be received by the open forward end of the piston head portion recess;

    wherein, gas pressure from the barrel bore causes the piston to reciprocate from its forward position, where the head portion recess extends over and occludes the tubular extension, to its rearward position, where the head portion recess disengages from the tubular extension, *allowing gas to exhaust through the tubular extension and forward end of the control valve to atmosphere.*

*Id.* at 5:5 – 36; 6:1 – 3 (emphasis added).  Given the alleged benefits of the patented system, SAC

sought to purchase the gas piston system claimed in the Patent to produce the system at scale,

incorporate it onto rifles it manufactures and sell around the world, and to develop and sell a kit

such that prior purchasers of SAC-manufactured rifles could retrofit the system onto those rifles.

Oliver Deposition Transcript, attached here to as **Exhibit 3**, at 36:7 – 18.

---

[3]     In prior art systems, excess gas would be vented inside a forearm or hand guard, causing a significant transfer of heat to an area where the user commonly places a hand for supporting the rifle.  *Id.*, at 1:30-36.  This can result in injury to the operator.

### c. Pre-Agreement Dealings and Intentions

Knowing that SAC was interested in purchasing the gas piston system claimed in the Patent, Mr. Brown flew to SAC's facilities in Arizona to perform what is commonly referred to as a Mil-Spec Test.[4]  Ex. 2 at 55:1 – 7.  The test consisted of multiple people firing an AMBI rifle with the gas piston system incorporated.  *Id*. at 57:7 – 12.  This test was important to SAC "[t]o properly check the [system's] operation."  *Id*.

After the successful Mil-Spec test, Mr. Kalua informed Mr. Brown via text message that SAC decided to move forward with the purchase of the Patent.[5]  Ex. 2 at 67:17 – 68:11.  Prior to finalizing the Agreement, Messrs. Brown and Kalua discussed SAC's plan to manufacture and sell the system for use on its rifles:

> Q: And you say [in your email] "The patent system will ensure that Strategic Arms Corps will lead the way with new innovative technology."  Do you see that?
>
> A: Yes, sir, I do.
>
> Q: So you knew [prior to execution of the Agreement] that SAC planned on selling the gas piston system, correct?
>
> A: …I don't know what they're going to sell to, who they're going to sell, or what. *I just know it's going to go on their product* .…  That's all I know.

Brown Deposition Transcript, attached hereto as **Exhibit 4**, at p. 113:19 – 114:8 (emphasis added); *id*. at 140:2-4 ("… I wanted [my design] to be successful.  I don't want it to be where it just sits in a closet."); *see also* Ex. 1 at 40:20 – 41:9 (During a tour of SAC's facility in Phoenix, Mr. Brown was told that SAC intended to sell the gas piston system with SAC's rifles).

---

[4]      A Mil-Spec Test is a test to ensure that the system could meet certain military specifications. Ex. 2 at 55:6 – 10.

[5]      Mr. Kalua became CEO of SAC in May 2018 and was the only SAC employee involved in the pre-execution dealings and negotiations leading up to the Agreement.  Ex. 2 at 38:3 – 6; 72:19 – 73:1.

In addition to the mere assignment of the Patent, Mr. Brown understood that the proposed transaction between the Parties was far broader:

Q: With this purchase price, SAC would receive legal sign-over of documents including patent ribbon, correct?

A: Yes.

Q: So that was, did that mean to you that you would assign over the patent or AMBI would assign over the patent to SAC as part of this sale?

A: With a one-time or two part complete payment, yes.

Q: [AMBI would also] provide [a] full technical data package, which is the TDP[6] that we talked about earlier, correct?

A: Yes, sir.

Q: And that was ultimately provided in September of 2018, correct?

A: Yes, sir.

Q: SAC would get from AMBI owners' manuals [for the gas piston system], and those were provided, correct?

A: Correct.

Q: SAC would get two full rifle samples [with gas piston systems attached], which was provided, correct?

A: Yes.

Q: SAC would get sample piston and bolt carrier assemblies for manufacturing samples, correct?

A: Correct.

Q: Were those provided?

A: Yes….

Q: SAC would get product engineering support for the [entire life of the patent], correct?

---

6        TDP stands for "technical data package" and includes models, prints, and blueprints for the AMBI gas piston system. Ex. 4 at 93:17 – 20.

A: Yes. [AMBI is an] engineering firm. [AMBI] would support [SAC], engineering, engineering support….

Ex. 4 at p. 114:21 – 116:13.

From SAC's perspective, it entered into the Agreement with every intention of acquiring "a plug and play" system to manufacture and incorporate onto SAC's rifles.[7] Ex. 1 at 37:20 – 21. In approximately April 2018, Messrs. Schincariol and Kalua met with Mr. Brown, who indicated that the gas piston system claimed in the Patent would indeed seamlessly adapt onto SAC's rifles. *Id.* at 38:10 – 39:6. As such, SAC reasonably believed that successful manufacturing and incorporation of the gas piston system was a condition to payment. As succinctly stated by Mr. Schincariol, "Why would I pay $2.5 million for a system that doesn't … fit my system?" *Id.* at 98:1 – 4. Mr. Brown was familiar with SAC's rifles, and knew that Mr. Schincariol (speaking for SAC) "was looking for a system that would fit my rifle." *Id.* at 98:15 – 16.

  d.  *The Agreement*

The parties entered into the Agreement on August 24, 2018 under the belief that SAC could manufacture the gas piston system claimed in the Patent and adapt it onto its rifles. Under the terms of the Agreement, SAC agreed to pay AMBI the sum of Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00 USD) in 25 equal monthly installments of One Hundred Thousand and 00/100 Dollars ($100,000.00 USD) beginning in September 2018. ECF 43-5. Also, pursuant to the Agreement, AMBI agreed to assign the Patent to SAC after receipt of payments in full.[8]

---

[7]     Mr. Schincariol, who is Brazilian and a native Portuguese speaker, uses the colloquial term "plug and play" synonymously with the term "turnkey," meaning that he expected that the AMBI gas piston system could be simply added to SAC's rifles with little engineering efforts.
[8]     Notwithstanding the terms of the Agreement, AMBI assigned the Patent to SAC on September 17, 2018, before payment in full was received.

AMBI's attorneys drafted the Agreement, which is less than two pages and consists of five enumerated paragraphs. *See* Agreement; Kalua Deposition Transcript at 134:21 – 135:3. Notably, the Agreement does not include a standard integration clause.[9]

### e. The Purpose of the Agreement was Frustrated.

The purpose of the Agreement – namely, to provide SAC with a gas piston system that could be manufactured and incorporated onto SAC's rifles – was ultimately frustrated. In this regard, Dale Wallace ("Mr. Wallace"), SAC's former head of quality control,[10] and Jack Oliver ("Mr. Oliver"), SAC's current head of project management, head of engineering and head quality assurance,[11] both testified that the gas piston system was not compatible with SAC's rifles because it did not have enough clearance to fit under SAC's handguards. Ex. 5 at 44:15 – 45:5; 94:14 – 17; Ex. 3 at 45:18 – 47:21; 164:8 – 165:17. In engineering terms, there were tolerance issues.[12] Ex. 5 at 51:14 – 52:9. These tolerance issues prevented SAC from manufacturing the gas piston system for incorporation onto SAC's rifles. *Id*. at 52:6 – 9. As Mr. Wallace explained, while SAC was able to modify the gas piston system to fit *one* rifle, it was unable to engineer it for production as the parties intended:

> Q: Was SAC unable to have a rifle that adapted the SAC piston available as of January 2019, given that you were able to adapt the system as of September 2018?
>
> A: No, we were not able to put it on for a production rifle for January.

---

[9]  SAC did not engage legal counsel to assist with this transaction. Ex. 2 at 77:11 – 14.

[10]  Wallace Deposition Transcript, attached hereto as **Exhibit 5**, at 14:10 – 16. Mr. Wallace was responsible for inspecting and making sure that all SAC firearms were of sound quality. *Id*., at 14:17 – 25.

[11]  Ex. 3 at 9:13 – 10:2.

[12]  Tolerance in this context refers to the clearance variation between two parts. No machine can manufacture any kind of component to the precise same measurements each time, so there must be acceptable degrees of variation. A manufactured component that is out of tolerance is not a usable part. By way of simple example, a 10 mm component that is manufactured on a machine having a tolerance of $\pm$ .2 mm could be anywhere between 9.8 and 10.2 mm in size when manufactured. In order to be in tolerance with other components and thus usable in a device or system, that variation must not interfere with the maximum or minimum tolerances of adjacent components. Ex. 5 at 51:11 – 52:9; Ex. 3 at 74:18 – 75:15.

Q: What do you mean, a production rifle?

A: As in, you know, when you're showing what you currently or what your future offerings are.  And we were not there yet, and able to put on a rifle and market it to the public or to anybody else, saying that this is ready for production.

Q: Do you know what prevented you from getting to the point where you could have a firearm ready as of January 2019?

A: We had not been able to fully adapt it to our rifle platform.

Q: How so?

A: Other than the modified one to fit on the shorthander, which there was – yes, it fit, but there were still [tolerance] issues with it.

*Id*. at 50:10 – 51:8.

While SAC was making efforts in-house to engineer the gas piston system piston to adapt onto its rifles, SAC sought additional engineering and consulting services from Mr. Brown.  Ex. 2 at 96:10 – 21 (stating that SAC contacted Mr. Brown when they found out the gas piston system "didn't fit" and that Mr. Brown worked with the SAC team to attempt to help SAC adapt the piston system onto its rifles); Ex. 4 at 139:7 – 16.  Mr. Brown traveled from Maryland to SAC's facility in Arizona to work with SAC's engineers to accomplish the mutual goal of getting the gas piston system to fit on SAC's rifles.  *Id.*; Ex. 3 at 89:9 – 15; Ex. 4 at 125:3 – 8. These efforts, however, ultimately proved unsuccessful and SAC has been unable to manufacture or produce a rifle with the gas piston system adapted.  Ex. 1 at 129:9 – 21.

The parties did not once discuss payment for these services, nor did Mr. Brown ever broach the subject with SAC or invoice SAC for these services.  Mr. Brown testified repeatedly at his deposition that he did not intend on charging SAC for any engineering services:

Q: There's no mention there of charging for engineering support, correct?

A: There's no mention in there of prices or charging anything, yes.

8

> Q: And there's no mention in the [Agreement] of charging for engineering support, correct?
>
> A: That's correct.

Ex. 4 at 116:14 - 21.  Mr. Brown further testified:

> Q: And what did you say to [Mr. Schincariol] with regards to charging for engineering support?
>
> A: I stated to [Mr. Schincariol] that if [SAC] buys my patent I will gladly help him with product support.  I did not say I would charge him.  I did not give him a price. All I said was I would help SAC with their processes.
>
> Q: Was there any other conversation with [Mr. Schincariol] or anybody else at SAC about the provision of support?
>
> A: No, sir.
>
> Q: Okay.  So in that April 23rd meeting you did not indicate that AMBI would charge for product support correct?
>
> A: No, sir, but I told him I would give him that support if he bought the patent.

*Id*. at 119:15 – 120:7.  Indeed, to this day, AMBI has never sent SAC an invoice for any consulting services.  *Id*. at 118:13 – 17; *see also* Ex. 2 at 136:5 – 8.

Despite the best efforts of Mr. Brown and SAC, the parties were unable to engineer the gas piston system so that SAC could manufacture and fit it on its rifles.  Ex. 1 at 129:9 – 21.  Given this fundamental failure and complete frustration of the parties' intentions in entering to the Agreement, SAC ceased making payments to AMBI.[13]

> ### f.   *Invalidity of the Patent*

---

[13]     AMBI incorrectly attributes this dispute to SAC's alleged financial inability to honor its payment obligations under the Agreement.  ECF 43-2 at 9.  This mischaracterization is directly contradicted by the testimony of Mr. Schincariol who testified that SAC's business is successful and profitable.  Ex. 1 at 148:9 – 150:3 ("The American market is buying everything they can, so everything [SAC produces, it] can sell…Everything [SAC] can produce [it] can sell.  The market is buying everything.").

After the parties' relationship ended, SAC became aware of serious questions regarding the validity of the Patent. In this regard, SAC retained gunsmithing and firearms expert David M. Lauck ("Mr. Lauck") to opine on the obviousness of the invention claimed in the Patent.[14]  In his Expert Report, Mr. Lauck opines that the invention claimed in the Patent was indeed obvious:

> An objective individual with ordinary skill in the art [of gunsmithing or gun design and manufacturing] would have known that this general method of operation for gas operated rifles and carbines was in active use years before 2016[15] and would have been obvious to such a person of ordinary skill in the art.

Expert Report of Dave M. Lauck at 2, attached hereto as **Exhibit 6**.  Mr. Lauck's Report goes on to analyze the obviousness of the invention claimed in the Patent and the historical background of gas pressure systems in firearms, giving a multitude of examples where gas piston systems similar to that claimed in the Patent have been used on other rifles.  Mr. Lauck's Report concludes:

> As shown in this report above and the attached claim chart, structures performing all of the functions performed by the parts of the invention set forth in the claims of [the Patent] were well known to persons of ordinary skill in the art prior to the filing date of [the Patent] in 2016.  There are really no functional differences between the sum total of the "prior art" (the pre-2016 information I reviewed and which is discussed in this report and in the attached claim chart) and [the Patent] claims, except that no one piece of information I reviewed shows the entirety of what [the Patent] claims.  Such persons of ordinary skill in the art had enough knowledge (the "level of ordinary skill in the pertinent art" mentioned above) that it would have been obvious for such persons to have put the pieces together to produce [the Patent] invention.  The inventions claimed in [the Patent] as a whole thus would have been obvious to persons of ordinary skill in the art.

---

[14]  Under the United States Patent Act, 35 U.S.C. § 101 *et seq.*, a patent for a claimed invention may not be obtained "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103.

[15]  The application leading to issuance of the Patent was filed on October 25, 2016 (the "Priority Date").

*Id.* at 21-22.[16]  Thus, under the conclusions expressed by Mr. Lauck in his report, the Patent is invalid because the claimed invention would have been obvious to a person of ordinary skill in the field as of the Priority Date.

## III.   STANDARD OF REVIEW

Summary judgment is proper only where the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  In reviewing a motion for summary judgment, a court must view all facts in a light most favorable to the non-moving party, and must draw all justifiable inferences in the non-moving party's favor.  *Ricci v. DeStefano*, 557 U.S. 557, 586, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009).  At the summary judgment stage, the function of the judge "is not to determine the truth of a matter or to weigh credibility but to determine whether there is any genuine issue of fact that can only properly be resolved by a finder of fact because it could reasonably be resolved in favor of either party."  *Id.*

Summary judgment as sought by AMBI is not appropriate here as genuine disputes of material fact exist regarding the purpose of the Agreement, whether that purpose was frustrated, and whether the consideration paid by AMBI – namely, assignment of the Patent – had any value. On the other hand, summary judgment on Count II of AMBI's Complaint (for unjust enrichment) is appropriate as Mr. Brown himself has conceded that there was never any intent for AMBI to charge SAC for any consulting services.

## ARGUMENT

**IV.    A Genuine Dispute of Material Fact Exists Regarding the Agreement and its Purpose.**

---

[16]    Mr. Lauck also issued a Rebuttal Report and Supplemental Report.  These additional reports offer opinions entirely consistent with his initial Report.

Count I in AMBI's Amended Complaint asserts a breach of contract claim against SAC for failure to pay the full purchase price identified in the Agreement.  Under Maryland law, the elements of breach of contract claim are "1) a contractual obligation and 2) a material breach of that obligation.  The elements of a contract, in turn, are offer, acceptance, and consideration." *Chubb & Son v. C & C Complete Servs., LLC*, 919 F. Supp. 2d 666, 678 (D. Md. 2013) (internal quotations and citation omitted).

In arguing that summary judgment is appropriate on Count I, AMBI merely recites the elements for a claim of breach of contract, but fails to recognize that evidence exists that creates a genuine dispute regarding what the parties understood the Agreement to encompass.  "The cardinal rule of contract interpretation is to give effect to the parties' intentions."  *Neal v. Pentagon Fed. Credit Union*, No. CV ELH-18-451, 2019 WL 4038564, at \*11 (D. Md. Aug. 27, 2019) (internal quotations omitted).   In interpreting a contract, Maryland courts attempt to discern "what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Id*.

If a contract is ambiguous, "extrinsic evidence is admissible to determine the intentions of the parties …."  *C B Structures, Inc. v. Potomac Elec. Power Co*., 122 F. Supp. 3d 247, 252 (D. Md. 2015).  In making the determination of whether a contract is ambiguous, courts look at "the entire language of the agreement, not merely a portion thereof and apply the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Sky Angel U.S., LLC v. Discovery Commc'ns, LLC*, 885 F.3d 271, 277 (4th Cir. 2018) (internal quotations omitted); *Ambling Mgmt. Co. v. University View Partners, LLC*, 581 F. Supp. 2d 706, 712 (D. Md. 2008) (same); *Sierra Club v. Dominion Cove Point LNG, L.P*., 216 Md. App. 322, 343, 86 A.3d 82, 94 (2014) (considering parties' intentions in interpreting contract).  Applying

12

these same interpretation principles, other courts have held that an omission of a material issue or issues can create an ambiguity. *See, e.g.*, *In re World Trade Ctr. Disaster Site Litig.*, 754 F.3d 114, 122 (2d Cir. 2014) ("an omission as to a material issue can create an ambiguity ... where the context … suggests that the parties intended a result not expressly stated[.]"); *Louis Dreyfus Energy Corp. v. MG Ref. & Mktg., Inc.,* 2 N.Y.3d 495, 505, 812 N.E.2d 936 (2004); *In re Mobilactive Media, LLC*, No. CIV.A. 5725-VCP, 2013 WL 297950, at \*16 (Del. Ch. Jan. 25, 2013) ("[C]ourse of performance . . . may also be used to supply an omitted term when a contract is silent on [the] issue.").

       *a. The Agreement Encompassed More Than What was Written.*

AMBI describes the manufacturing and adaptability of the gas piston system to SAC's products as "immaterial," but goes on to discuss it at length. If the Agreement was meant to be the extent of the transaction and the parties only intended to assign the Patent from AMBI to SAC as AMBI argues, it would have included an integration clause. As the drafting party, AMBI was free to include such a provision but did not.

The pre-assignment actions and words of the parties, however, are indicative of a different interpretation – namely, that the parties knew the purpose of the Agreement went well beyond what was explicitly stated in the Agreement. Indeed, why would Mr. Brown bring sample rifles equipped with the gas piston system from Maryland to Arizona, transfer owners' manuals, hand over a full technical package, and provide significant consulting services to AMBI if the purpose of the parties' agreement was simply for AMBI to assign the Patent to SAC in return for payment of $2.5 Million? The answer is clear - Mr. Brown understood that SAC's successful ability to manufacture the gas piston system and incorporate it onto their rifles was a necessary condition to payment. It follows that, at a minimum, there are underlying genuine disputes of material facts

related to the Agreement so AMBI is not entitled to summary judgment on Count I of its Complaint.

**V.     There are Genuine Disputes of Fact Regarding Each of SAC's Counterclaims so Summary Judgment is Not Warranted.**

AMBI disingenuously attempts to characterize SAC's legitimate contract defenses as "scorched earth litigation over claims [SAC] has failed to sustain as a matter of law."  ECF 43-2 12-13.   Notwithstanding AMBI's baseless contentions, SAC's Counterclaim includes several legitimate defenses.  At a minimum, SAC's defenses highlight genuine disputes of material facts, making summary judgment inappropriate.

> *a. Summary Judgment is not Warranted on SAC's Failure of Consideration Counterclaim.*

There is no dispute that assignment of the Patent was AMBI's primary consideration for the contract between AMBI and SAC wherein SAC agreed to pay AMBI $2.5 Million.  If the patent is invalid, as SAC alleges in its Counterclaim, and is confirmed by its expert, then AMBI utterly failed to provide SAC with the requisite consideration for SAC's $2.5 Million. While AMBI points _solely_ to the report and testimony of its own expert confirming the validity of the Patent, there can be no dispute that SAC, through its own expert, has raised serious and significant concerns about the validity of the Patent which the finder of fact in this case must resolve. *HVLPO2, LLC v. Oxygen Frog, LLC*, 949 F.3d 685, 690 (Fed. Cir. 2020) ("the issue of obviousness … is an issue that may be properly submitted to, and decided by a jury."); *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1362 (Fed. Cir. 2012) (jury presented with conflicting expert testimony and decided patent obviousness question).

 If the finder of fact decides that the Patent is indeed invalid, then the primary consideration for which SAC committed to pay AMBI $2.5 Million would be valueless, thereby making the

Agreement unenforceable and void *ab initio*. *Manning v. Mercatanti*, 898 F. Supp. 2d 850, 858 (D. Md. 2012); *Cunningham v. LeGrand*, No. 2:11-CV-0142, 2012 WL 2054112, at *9 (S.D.W. Va. June 5, 2012) ("[T]he law is the same in West Virginia, Florida, and elsewhere. The absence of consideration results in a contract that is void ab initio.").

SAC contends that the Patent is invalid under Section 103 of the United States Patent Act, which provides that a patent is invalid "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains."  35 U.S.C. § 103.[17]   In support of this position, SAC offered the report and testimony of Mr. Lauck, a world-renowned rifleman and certified firearms instructor. Ex. 6 at 23.  Mr. Lauck has also served as the president of DL Sports, Inc., a federally licensed firearms manufacturer, specializing in the manufacture of professional custom firearms, firearms development and designs, as well as firearms training and consulting, for over thirty (30) years. *Id*.

Notably, AMBI does not challenge Mr. Lauck's credentials, experience or the propriety of SAC's reliance on his expert testimony in this case. Rather, AMBI simply chooses, for the most part, to ignore Mr. Lauck's opinions.

As noted above, Mr. Lauck opines in his Expert Report that the invention claimed in the Patent was indeed obvious as of the Priority Date, and therefore, the Patent is invalid under Sec. 103:

---

[17]     AMBI devotes a significant portion of its Motion for Summary Judgment rebutting an invalidity argument not raised by SAC.  In this regard, AMBI argues that the Patent is not "anticipated" by the prior art, and is therefore, valid under 35 U.S.C. § 102.  ECF 43-2 at 25-27.  Mr. Lauck does not, however, contend that the Patent violates Sec. 102.  Rather, Mr. Lauck contends that the invention claimed in the Patent violates § 103, *i.e.*, the claimed invention *as a whole* would have been obvious to a person having ordinary skill in the art as of the Patent's Priority Date.

> An objective individual with ordinary skill in the art [of gunsmithing or gun design and manufacturing] would have known that this general method of operation for gas operated rifles and carbines was in active use years before 2016 and would have been obvious to such a person of ordinary skill in the art.

Ex. 6 at 4. Mr. Lauck than goes on to analyze the obviousness of the invention claimed in the Patent and the historical background of gas pressure systems in firearms, giving a multitude of examples where gas piston systems similar to that claimed in the Patent have been used on other rifles, concluding that:

> As shown in this report above and the attached claim chart, structures performing all of the functions performed by the parts of the invention set forth in the claims of [the Patent] were well known to persons of ordinary skill in the art prior to the filing date of [the Patent] in 2016. There are really no functional differences between the sum total of the "prior art" (the pre-2016 information I reviewed and which is discussed in this report and in the attached claim chart) and [the Patent] claims, except that no one piece of information I reviewed shows the entirety of what [the Patent] claims. Such persons of ordinary skill in the art had enough knowledge (the "level of ordinary skill in the pertinent art" mentioned above) that it would have been obvious for such persons to have put the pieces together to produce [the Patent] invention. The inventions claimed in [the Patent] as a whole thus would have been obvious to persons of ordinary skill in the art.

*Id*. at 20-21. Mr. Lauck's Report also includes claim charts detailing, on a claim-by-claim basis, how the prior art disclosed each and every element of every claim of the Patent. *Id*. at ___. While AMBI is obviously free to challenge the accuracy and reliability of Mr. Lauck's opinions with its own expert - indeed, it has named its own expert to challenge these opinions – there cannot be any question that Mr. Lauck's opinions raise genuine disputes of material facts regarding AMBI's validity of the Patent, and thus, the propriety of AMBI's consideration for SAC entering into the Agreement.

The issue of whether the invention claimed in the Patent would have been obvious to a person of ordinary skill in the art as of the Priority Date, thus, rendering the Patent invalid under Sec. 103, is a clear "battle of the experts," which should not be resolved on summary judgment.

*See Reyazuddin v. Montgomery Cty.*, Maryland, 789 F.3d 407, 417 (4th Cir. 2015) ("At this point … it is undisputed that [both proffered expert witnesses] qualify as experts.  The evidence therefore sets up a battle of the experts, which should not be resolved at summary judgment."); *Green v. Wing Enterprises, Inc.*, No. CV RDB-14-1913, 2015 WL 8315773, at *7 (D. Md. Dec. 9, 2015) ("Indeed, in a battle of the experts, the comparison of the facts upon which an opinion is based with the opinion itself is precisely the role of the jury.").  Indeed, the Federal Circuit consistently holds that "where experts present conflicting opinions on a factual matter pertinent to a determination of obviousness, summary judgment is often inappropriate." *Zoltek Corp. v. United States*, 95 Fed. Cl. 681, 693 (2010) (collecting cases).  As AMBI and SAC have both offered experts to testify on the issue of the Patent's validity, with each coming to different conclusions, summary judgement in favor of AMBI would be improper.

  b.  *Summary Judgment is not Warranted on SAC's Implied Warranty of Fitness for a Particular Purpose Counterclaim.*

An implied warranty of fitness for a particular purpose arises "[w]here the seller at the time of the contracting has reason to know a particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 358 (D. Md. 2011) (quoting Md. Code Ann., Com. Law § 2–315).  As set forth above, Mr. Brown fully understood SAC's purpose in entering into the Agreement; namely, to incorporate the gas piston system onto SAC's rifles for manufacture and sale.  *Supra*.  SAC relied on Mr. Brown's skill and judgment in furnishing suitable goods to meet this purpose, as he is the alleged inventor of the gas piston system claimed in the Patent, had significant experience in engineering firearms accessories, and was familiar with SAC's rifles.  Ex. 4 at 49:6 – 15 (Mr. Brown testifying that he is the inventor of the invention claimed in the Patent); Ex. 1 at 98:15 – 16.

AMBI argues for summary judgment on SAC's implied warranty counterclaim under the premise that the parties *only* conveyed a patent, which is not a good under the Maryland Commercial Code.   Notwithstanding this oversimplification, the Agreement contemplated more terms than just a mere patent assignment, including the transfer of gas piston system itself.  *Supra*.  The gas piston system is unquestionably a good, which is defined in the Maryland Commercial Code as "all things (including specially manufactured goods) which are moveable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Title 8) and things in action."  Md. Code Ann., Com. Law § 2–105(1).  It necessarily follows that the implied warranty of fitness for a particular purpose applies and summary judgment is inappropriate at this juncture due to genuine disputes of the material facts underlying the Agreement.

> **c.  Summary Judgment is Not Warranted on SAC's Frustration of Purpose Counterclaim.**

A contract will be discharged under the doctrine of frustration of purpose "where the purpose of [the] contract is completely frustrated and rendered impossible of performance by a supervening event or circumstance[.]"  *Panitz v. Panitz*, 144 Md. App. 627, 639, 799 A.2d 452, 459 (2002).  Maryland courts examine three factors when determining whether the doctrine applies: "(1) whether the intervening act was reasonably foreseeable; (2) whether the act was an exercise of sovereign power; and (3) whether the parties were instrumental in bringing about the intervening event."  *Id*.  In order to succeed under the frustration of purpose doctrine, performance under the contract must be objectively impossible.  *Id*. at 640.  Here, the purpose of the Agreement was completely frustrated and performance was objectively impossible.

As discussed above, both parties intended their transaction to encompass the manufacture and incorporation of the gas piston system claimed by the Patent onto SAC's rifles.  That intention

18

was completely frustrated as both AMBI and SAC unsuccessfully undertook to engineer the piston system for manufacture and incorporation onto SAC's rifles.

In support of its assertion that this purpose was not objectively impossible, AMBI references certain videos depicting SAC employees test firing rifles with the gas piston system attached.[18]  As discussed above, the video depicts *one* gas piston adapted onto *one* rifle.  This is a far cry from undisputed proof that the gas piston system was ready for large scale production and attachment on hundreds or thousands of rifles.  Messrs. Wallace and Oliver, both of whom were tasked with engineering the AMBI piston system for manufacture and incorporation onto SAC's rifles, testified that despite efforts by both AMBI and SAC, the piston system could not be engineered such that it could be manufactured and incorporated as the parties intended, rendering performance of the Agreement objectively impossible and the parties' purpose completely frustrated.  Ex. 1 at 129:9 – 21.

AMBI also points to a report dated April 1, 2019 (the "April 1 Report") which it claims conclusively establishes that the piston system was indeed incorporated onto SAC's rifles.  *See* ECF 43-11.  This assertion, however, is misplaced.  First, despite AMBI's characterization, the April 1 Report is ambiguous and does not detail the "continued, successful testing of its own rifles with the adapted gas piston system."  ECF 43-2 at 7.  As Mr. Wallace testified, while SAC was able to incorporate a *single* gas piston onto a *single* rifle, it could not manufacture the system due to tolerance issues.  *Supra*.  Additionally, there is an Appendix referenced in the April 1 Report titled "TABLE 1 DESCRIPTION AND PROBABLE CAUSES," which lists a variety of failures

---

[18]     Notably, the videos that AMBI claims shows the rifles working properly actually depict multiple malfunctions.  In SAC00000806, for example, the operator, SAC engineer Garrett Stevens, indicates that the rifle is "not seating." Ex. 3 at 98:21.  When questioned what that term means, Mr. Oliver testified that the malfunction was related to the bolt in the bolt carrier and could be caused by "a myriad of reasons," including problems with the gas piston system.  *Id*. at 99:1 – 20.  The other videos also demonstrate questionable functionality.

and abbreviations but does not provide further detail.  ECF 43-11 at 10-11.  There is nothing in the record to shed light on this appendix, so its true meaning remains ambiguous.

There are also authenticity questions regarding the April 1 Report.  Mr. Oliver, the only current SAC employee in the engineering department, had not seen that report before this litigation.  Ex. 3 at 116:3 – 6.  Mr. Wallace, the control/engineering department manager when SAC acquired the gas piston system, testified that he did not prepare that report (notwithstanding his name appearing at the bottom), that he had not seen that report prior to his deposition, and that he does not recall ever transmitting that report.  Ex. 5 at 64:24 – 65:3; 70:13 – 24.  Mr. Wallace also expressed doubt that he was the author of the report, and that he did not recall performing all of the tests identified in it.  *Id.* at 70:25 – 71:3. ("But the wording of this document, it just does not sound as the way I type documents, nor do I remember doing an accuracy test.").  Summary judgment on SAC's frustration of purpose counterclaim is therefore not warranted.

### d.  Summary judgment is Not Warranted on SAC's Mistake Counterclaims

#### i.  Mutual Mistake

Here, the testimony of all parties and evidence uncovered in discovery indicates that AMBI and SAC entered into the Agreement upon a mutual mistake of fact.  Specifically, the parties believed that the gas piston system could be successfully manufactured for incorporation onto SAC's rifles.  Mutual mistake occurs "where there has been a meeting of the minds [ ] and an agreement actually entered into, but the instrument, in its written form, does not express what was intended by the parties thereto."  *Charter Oak Fire Ins. Co. v. Am. Capital, Ltd.*, No. CIV.A. DKC 09-0100, 2011 WL 856374, at *15 (D. Md. Mar. 9, 2011).

The record makes clear that AMBI was well aware of SAC's intention to manufacture the gas piston system for incorporation onto, and sale with, its rifles and demonstrates that the parties

entered into the Agreement with this understanding.  As discussed above, Mr. Brown testified that he knew that SAC planned to incorporate the gas piston system on its rifles.  Ex. 4 at 114:6 – 7. SAC clearly intended to purchase a gas piston system that it could manufacture and would fit onto its rifles.  If not, SAC would have been paying $2.5 Million for nothing but the paper on which the Patent is published.  The parties' actions, dealings, and testimony all reveal a genuine dispute of material fact that the Agreement, in its written form, does not identify everything that was intended by both AMBI and SAC.  Due to this genuine dispute, summary judgment is inappropriate on Count I of SAC's Counterclaim.

*ii.   Unilateral Mistake*

Alternatively, it is clear that SAC entered into the Agreement under a fundamental unilateral mistake.  Responding to this, AMBI claims that SAC's counterclaim for unilateral mistake fails because SAC did not allege "intentional, culpable conduct, such as fraud, duress or undue influence." ECF 43-2 at 16.  In making this assertion, AMBI cites to *Creamer v. Helferstay*, 294 Md. 107, 448 A.2d 332 (1982), a case which has been distinguished and narrowed by this Court.  In this regard, in *Saul Holdings Ltd. P'ship v. SeraCare Life Scis., Inc.*, No. CIV.A. TDC-14-1444, 2015 WL 772564, at *1 (D. Md. Feb. 23, 2015), Judge Chuang analyzed *Creamer*'s language, on which AMBI relies, that "in the absence of intentional, culpable conduct such as fraud or duress, [the Court of Appeals of Maryland] has consistently refused to relieve a party of his contractual obligations based upon that party's unilateral mistake concerning the meaning of a term or requirement of the contract."  *Saul Holdings Ltd. P'ship*, 2015 WL 772564 at *1 (brackets in original).  Rejecting plaintiff's assertion that defendant's purported mistake precluded it from receiving equitable relief, Judge Chuang took a narrow view of the *Creamer* holding: "the court in *Creamer* addressed whether a unilateral mistake could justify a specific remedy…."  *Id*.  Indeed,

21

Judge Chuang held that "*Creamer* should not be read as an inflexible rule applicable to all scenarios." *Id.*

Thus, the "intentional, culpable conduct" language AMBI references is not fatal to AMBI's unilateral mistake counterclaim.  The *Saul Holdings* case makes clear that this rule is not dispositive, so SAC is not required to allege or prove any intentional, culpable conduct to support its unilateral mistake counterclaim.    The genuine disputes of material facts discussed *supra* preclude summary judgment on SAC's mistake counterclaims.

**VI.    SAC is entitled to summary judgment on Count II (Unjust Enrichment).**

Count II of AMBI's Complaint asserts a claim for unjust enrichment.  Unjust enrichment "provides a restitutionary remedy where a defendant receives a recognizable benefit that it would be inequitable for her to retain." *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 257 (4th Cir. 2020).  Under Maryland law, a plaintiff must establish three elements to succeed on a claim of unjust enrichment: "(1) [a] benefit [being] conferred upon the defendant by the plaintiff; (2) [a]n appreciation or knowledge by the defendant of the benefit; and (3) [t]he acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value."  *Id.* at n.9 (internal quotations omitted; brackets in original).  Additionally, "a claim of unjust enrichment, which is a quasi-contract claim, may not be brought where the subject matter of the claim is covered by an express contract between the parties." *Kantsevoy v. LumenR LLC*, 301 F. Supp. 3d 577, 599 (D. Md. 2018).

In Count II, AMBI specifically alleges that Mr. Brown:

[C]onferred a benefit upon Defendant by sharing its ideas and intellectual property and providing its time and experience in connection with the Defendant's use and integration of the Patent, and derivatives therefrom, together with the work product and deliverables resulting from Plaintiff's engineering and consulting services, into its business and product offerings.

ECF 2 at ¶ 29.  As a result, AMBI seeks two-hundred twenty two thousand and 00/100 dollars ($222,000.00 USD) in compensation for the services Mr. Brown provided to re-engineer the gas-piston system to fit onto SAC's rifles for manufacture and ultimate sale.

AMBI argues here that the Agreement *only* included the assignment of the Patent.  As discussed above, that is just not the case.  The evidence deduced in discovery reveal that one of the fundamental conditions of the Agreement was that AMBI would provide consulting services to ensure SAC's successful adaptation of the Patent's gas piston system for manufacture and incorporation with SAC's rifles.   While this effort ultimately proved unsuccessful, there is simply no injustice or inequity in allowing SAC to retain the benefit (if any) of Mr. Brown's services without payment.  Accordingly, summary judgment should be entered on Count II - AMBI's belated attempt to seek payment for services for which it never intended to be paid.

> *a.   AMBI never charged or intended to charge SAC for its consulting services.*

AMBI never intended to charge SAC for any consulting or engineering services related to the gas piston system claimed in the Patent.  As discussed in detail *passim*, the parties never discussed payment for Mr. Brown's service, nor did Mr. Brown or AMBI ever intend to charge SAC for the services:

> Q: Did AMBI ever send an invoice to SAC for any engineering support, manufacturing engineering support, product engineering support, or tooling, future design, and program process report?
>
> Mr. Brown: No, we didn't.
>
> *   *   *
>
> Q: You indicate here that you were asked by SAC to help with the manufacturing process for the upper receivers, that you developed a process, that you provided CAD solids and prints of tombstones and fixtures for the horizontals, and that that was done free of charge, right?
>
> Mr. Brown: Yes, sir.
>
> Q: And you never sent an invoice for that work, did you?

23

Mr. Brown: No, sir.

Q: And similarly the other services that you identify [] regarding the rail, handguard and barrel nut package, the piston design bolt carrier, and development of the prototypes, those were all done free of charge, correct?

Mr. Brown: Yes, sir.

Q: And you never sent an invoice for that, correct?

Mr. Brown: That's correct.

Q: And are you seeking payment for those services now in this case?

Mr. Brown: Yes, sir.

Ex. 4 at 118:13 – 17; 136:9 – 137:9.

Mr. Brown's own statements make a *prima facie* demonstration the services were gratuitous, so an unjust enrichment claim must fail as a matter of law.

> **b.   SAC was not *unjustly* enriched.**

Even if SAC was enriched in some way, it was not unjustly enriched under Maryland law. Unjust enrichment in Maryland requires that circumstances exist that render a defendant's acceptance of a benefit inequitable without payment. *Baehr*, *supra*.  "[W]hile a person is enriched if he has received a benefit, the law does not consider him *unjustly* enriched unless the circumstances of the receipt of the benefit are such as between the two that to retain it would be unjust."  *Hobbs v. St. Martin*, 320 F. Supp. 3d 748, 752 (D. Md. 2018) (emphasis in original) (quoting *Bank of Am. Corp. v. Gibbons*, 173 Md.App. 261, 918 A.2d 565, 576 (Md. Ct. Spec. App. 2007)).

Notwithstanding the validity of the Agreement,[19] AMBI's claim for unjust enrichment fails because SAC was not *unjustly* enriched.  As understood by both parties and expressly stated by Mr. Brown, SAC "would get product engineering support for the patent life." *Supra*, pg. 5.  There is no dispute that neither Mr. Brown nor any other representative of AMBI discussed payment for the consulting services.  Indeed, Mr. Brown conceded that AMBI has yet to invoice SAC for these services to this very day.  Ex. 4 at 118:13 – 17; 136:9 – 137:9.

Even when viewing the evidence in a light most favorable to AMBI, it is clear that the circumstances are such that retaining any benefit conferred by Mr. Brown/AMBI alleged in Count II resulted in no injustice.  As such, there is no genuine dispute of material fact and SAC is entitled to summary judgment on Count II of AMBI's Complaint.

**CONCLUSION**

For the reasons discussed above, SAC respectfully requests this Court deny AMBI's Motion for Summary Judgment and grant SAC's Cross Motion for Summary Judgment.

---

[19]    AMBI's unjust enrichment claim also fails as a matter of law if the Agreement is deemed valid. *All Weather, Inc. v. Optical Sci., Inc.*, 443 F. Supp. 3d 656, 667 (D. Md. 2020) ("It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties.").

Date: November 5, 2020                         Respectfully submitted,

                                     /s/ Steven E. Tiller
                                     Steven E. Tiller (Bar No. 11085)
Timothy R. Willman (Bar No. 21088)
Whiteford, Taylor & Preston, LLP
Seven Saint Paul Street, Suite 1500
Baltimore, Maryland 21202-1636
stiller@wtplaw.com
twillman@wtplaw.com
(410) 347-9425
(410) 223-4325

*Attorneys for Strategic Armory Corp LLC*