# EXHIBIT 4

```
                                                          Page 1

 1           UNITED STATES DISTRICT COURT FOR THE

 2                    DISTRICT OF MARYLAND

 3                     (Northern Division)

 4

 5    AMBIMJB, LLC.

 6

 7              Plaintiff

 8

 9    v.                                  Civil Case No.

10                                        1:20-cv-00807-JKB

11    STRATEGIC ARMORY CORPS, LLC

12

13              Defendant

14    --------------------------------/

15              The deposition by videoconference of

16    MICHAEL BROWN was held on Tuesday, August 11, 2020,

17    commencing at 9:25 a.m., virtual location, before

18    Robert A. Shocket, a Notary Public.

19

20

21    REPORTED BY: Robert A. Shocket
```

Page 46

1  services outside of the rifle industry?
2    A   We do. I have, I should say, just recently
3  developed a filter adapter for the coronavirus for the
4  surgeons to use in operating rooms.
5    Q.   So does AMBI typically just charge by the
6  hour for its services?
7    A   It normally didn't. Normally in the first,
8  I would say the first five years we actually consulted
9  for a gun company and we charged an hourly rate but
10 not, we charged a flat hourly rate because that person
11 was going to cover a flat rate for the year.
12   Q.   All right. Let me break that one down a
13 little bit because I'm not sure I understand it. It
14 sounds like AMBI had a particular customer, correct?
15   A    Correct.
16   Q.   Who was that customer?
17   A    In the beginning it was Arsenal Firearms.
18 Arsenal Firearms, USA.
19   Q.   And you say in the beginning; did Arsenal
20 Firearms change?
21   A    It changed to Archon.

Page 47

1    Q.   And what does Arsenal Firearms distribute?
2    A    Pistols right now.
3    Q.   Did it also distribute other arms or rifles
4  other than pistols?
5    A    Not that I know of.
6    Q.   Was there a time when Arsenal was AMBI's
7  only client?
8    A    Yes.
9    Q.   For how long?
10   A    For about the first five years.
11   Q.   So from roughly 2013 to 2018?
12   A    Correct.
13   Q.   And I just want to understand the general
14 nature of the compensation. Did AMBI just charge
15 Arsenal a flat yearly fee for its services?
16   A    Correct. They were willing to fill our
17 time for the year so we charged them a flat rate no
18 matter how much we worked on something or how little we
19 worked on something.
20   Q.   Did AMBI have a written agreement with
21 Arsenal?

Page 48

1    A    No, sir.
2    Q.   Did AMBI design or work on any gas piston
3  systems for Arsenal?
4    A    Yes, sir.
5    Q.   Did AMBI create any new designs of gas
6  piston systems for Arsenal?
7    A    Yes, the standard gas piston design.
8    Q.   To the extent that AMBI created anything
9  new for Arsenal, who owned it after creation?
10   A    Arsenal.
11   Q.   Did any of the work for Arsenal result in
12 the filing of patent applications?
13   A    I don't believe so. I think -- wait a
14 minute. There might be one, like a downward folding
15 stock or something that I might have worked with them,
16 or he might have asked me if he could be part of it
17 because I designed something. But other than that,
18 that was, I don't think their, their name's not on the
19 patent, though.
20   Q.   How many patent applications are you
21 identified on as an inventor?

Page 49

1    A    For AMBI or for Adcor?
2    Q.   Well, let's start with Adcor.
3    A    I couldn't tell you. It's a lot. From the
4  beverage, I have a lot in the beverage field and a lot
5  in the gun field.
6    Q.   How about for AMBI?
7    A    AMBI, there's, there's I believe ten or
8  eleven -- one, two, three, four, five, six, seven,
9  eight, nine -- I think there's ten, and I think there's
10 an eleventh one that's pending.
11   Q.   And I presume you're identified as an
12 inventor on all of those?
13   A    Yeah, the one that's pending is identified
14 for my son. He's the inventor on the one that's
15 pending.
16   Q.   Other than the patent at issue here, do any
17 of those patents relate to gas piston systems?
18   A    Just the patent that you're dealing with,
19 with this, this lawsuit.
20   Q.   Right. And that's U.S. Patent 9,816,769,
21 correct?

Page 90

1  will keep carbon from under the rails and out of the
2  upper receiver assembly." So, AMBI believed that this
3  system was unique because it exhausted excess gas out
4  of the front of the rifle?
5      A   In its own way, yes.
6      Q   And what were the problems with exhaust
7  coming out of other parts of the rifle?
8      A   An example, the heat underneath the
9  handguards, the carbon issues build up everywhere.
10 When they exhaust behind the gas block there's chances
11 that the carbon gets on the glass. When I say glass
12 I'm talking about scopes, optics, things of that
13 nature.
14     Q   What about, were there any problems with
15 exhausts being vented out the sides?
16     A   That could be the same issue.
17     Q   So the handguards could get hot, which
18 would make it difficult to shoot?
19     A   Yeah. I mean that would be the minor part
20 of it, mainly the carbon issue, and then the actual,
21 the hot air exhausting back where your hand, where your

Page 91

1  foregrip would be.
2      Q   And if it exhausts out the top that could
3  be an impediment to the shooter's sight, correct?
4      A   Sight, optics, you know, and in some, and
5  grip, because some people put their grip over the top
6  with their hand.
7      Q   Fair enough. And these were problems with
8  gas piston systems that were known in the industry
9  prior to 2016, right?
10     A   Yes, sir.
11     Q   This document in the third sentence says,
12 "This is low profile, durable and adjustable design
13 that can be added under all rail systems on AR-15 or
14 AR-10 platform." Correct?
15     A   That's what I say there.
16     Q   What, well is that true?
17     A   Well, of course it was, to my knowledge, at
18 the time when I wrote it, there was forty-some plus
19 handguards done knowing that it would fit underneath of
20 it. I didn't, you know, it could be, as we know now,
21 it could have clearance issues on a certain rail.

Page 92

1      Q   At the time when -- did you write this
2  document?
3      A   Actually my son wrote it for me.
4      Q   Which son?
5      A   Ryan.
6      Q   But you agreed with it when it was written,
7  correct?
8      A   Correct.
9      Q   And what led you to believe at that time
10 that it could be added under all rail systems on AR-15
11 or AR-10 platforms?
12     A   That terminology was all the rail systems
13 that I actually sampled and actually saw dimensionally.
14     Q   What systems, what handguard systems or
15 rail systems had you sampled?
16     A   CMMG. I mean there's a list of them. I
17 just, off the top of my head I can't give you all of
18 them.
19     Q   But when you say sampled does that mean you
20 had actually put them on a rifle with this gas piston
21 system using those different handguards?

Page 93

1      A   Some of them I did and some of them I know
2  that, their dimensions and that certain piston systems
3  that are same size as the AMBI system fit underneath
4  there. So I know that I can attribute that we will fit
5  in the same spot.
6      Q   When this document was written how many
7  rail systems had AMBI actually installed on guns with
8  bearing or incorporating the AMBI gas piston system?
9      A   I couldn't tell you the number. It wasn't
10 a lot. It was maybe a half a dozen or so at the time.
11     Q   Is there a reason you didn't provide this
12 document to SAC prior to execution of the patent
13 purchase agreement?
14     A   To my knowledge that document might have
15 been made just before this, you know, to give to them
16 with the TDP.
17     Q   What's a TDP?
18     A   Technical data package.
19     Q   And what would be included in the TDP?
20     A   Solid models, prints, blueprints. When I
21 say blueprints I should just say prints, and prints in

Page 110

1  Q. Did you consult with Mr. Bellamy about
2  that?
3  A. No, I didn't. Actually, you know, I can't
4  answer that question. I can't answer it whether I -- I
5  don't recall whether I asked him that, because I did
6  have contacts with him on this.
7  Q. Do you know whether SAC was represented by
8  counsel?
9  A. I don't know.
10 Q. Did SAC request the payments be made over
11 25 months?
12 A. That was their request.
13 Q. Now, as I understand it, I just want to
14 confirm, SAC made eleven payments, correct; they paid
15 $1.1 million?
16 A. Yes, sir.
17 Q. Paragraph 2 says, upon receipt of the above
18 payment in full, Assignor, which is AMBI, will assign
19 the patent to Assignee, who is SAC, correct?
20       THE WITNESS: I don't know, I mean, I'm
21 talking --

Page 111

1       MR. TILLER: Okay. You're back.
2       THE WITNESS: Yeah, then I seen that thing
3  popped up. I think this only happens to the person
4  who's being deposed. That's what it seems like. But
5  anyway, can you repeat the question and I'll answer it
6  again?
7       BY MR. TILLER:
8  Q. Yeah. Paragraph 2 says that upon receipt
9  of the payment in full AMBI will assign over the patent
10 to SAC, correct, essentially?
11 A. That's correct.
12      (Brown Exhibit 9 was marked for purposes of
13 identification.)
14 Q. Can you take a look at Exhibit 9? Do you
15 recognize that document?
16 A. I do.
17 Q. And again, while it's not Bates numbered
18 this is the executed patent assignment that was
19 included with the complaint, because this is the best
20 copy we could find. AMBI assigned over the patent on
21 September 17th, 2018, correct?

Page 112

1  A. Yes, sir.
2  Q. But at that point it had not received
3  payment in full, correct?
4  A. Yes, sir. That's true.
5  Q. Why did AMBI assign over the patent prior
6  to receiving the payment in full?
7  A. I was there on September 17th, 2018. Mr.
8  Kalua received the rifles and the parts, received the
9  TDP. I showed him the patent and he requested to have
10 it turned over. And I agreed to it. He promised me
11 that they were going to pay this thing off before the
12 first quarter of 2019, and he requested to have that
13 patent assigned to SAC in good faith. I immediately
14 said okay, I agree, and I called my patent attorney and
15 had him start the process while I was out there.
16 Q. So Mr. Kalua represented to you that the
17 full purchase price of two and a half million dollars
18 would be paid prior to the first quarter of 2019?
19 A. He told me it would be paid off early.
20 That's what he told me.
21 Q. Do you have any writing that indicates

Page 113

1  that?
2  A. No, sir, I don't.
3       (Brown Exhibit 10 was marked for purposes
4  of identification.)
5  Q. I would like you to take a look at what's
6  been marked as Exhibit 10. For the record this is
7  Bates numbered AMBI 1593. Do you recognize this
8  document?
9  A. Yes, I do.
10 Q. Who sent this email?
11 A. I did.
12 Q. And it was sent to Mr. Kalua on or about
13 June 25th, 2018, correct?
14 A. It was.
15 Q. And you'll see here that the, this is
16 before obviously the patent purchase agreement had been
17 signed?
18 A. Correct.
19 Q. And you say "The patent system will ensure
20 that Strategic Arms Corps will lead the way with new
21 innovative technology." Do you see that?

Page 114

1  A  Yes, sir, I do.
2  Q.  So you knew at that point that SAC planned
3  on selling the gas piston system, correct?
4  A  Um, I'm just, I don't know that they're
5  going to sell. I don't know what they're going to sell
6  to, who they're going to sell, or what. I just know
7  it's going to go on their product evidently. That's
8  all I know.
9  Q.  The next sentence says, the offer price is
10 $2.5 million in a one time payment or a first
11 installment of $1.5 million and a second installment of
12 $1.1 million for total of 2.6 million. Neither of
13 those options were ultimately agreed to, correct?
14 A  Correct. I was asked whether if we had an
15 opportunity to break it down in two payments, could I
16 do it, and, if so, make an offer.
17 Q.  And ultimately the parties agreed to two
18 and a half million dollars in 25 100,000 dollar
19 payments, correct?
20 A  That's correct.
21 Q.  With this purchase price, SAC would receive

Page 115

1  legal sign-over of documents including patent ribbon,
2  correct?
3  A  Yes.
4  Q.  So that was, did that mean to you that you
5  would assign over the patent or AMBI would assign over
6  the patent to SAC as part of this sale?
7  A  With a one-time or a two-part complete
8  payment, yes.
9  Q.  And AMBI would provide full technical data
10 package, which is the TDP hat we talked about earlier,
11 correct?
12 A  Yes, sir.
13 Q.  And that was ultimately provided in
14 September of 2018, correct?
15 A  Yes, sir.
16 Q.  SAC would get from AMBI owners' manuals,
17 and those were provided, correct?
18 A  Correct.
19 Q.  SAC would get two full rifle samples, which
20 was provided, correct?
21 A  Yes.

Page 116

1  Q.  SAC would get sample piston and bolt
2  carrier assemblies for manufacturing samples, correct?
3  A  Correct.
4  Q.  Were those provided?
5  A  Yes.
6  Q.  Are they provided at the same time as the
7  full rifle samples?
8  A  Yes, sir.
9  Q.  SAC would get product engineering support
10 for the patent life, correct?
11 A  Yes. We're an engineering firm. We would
12 support them, engineering, engineering support, but
13 this was based on paying the product off at one time.
14 Q.  There's no mention there of charging for
15 engineering support, correct?
16 A  There's no mention in there of prices or
17 charging anything, yes.
18 Q.  And there's no mention in the patent
19 purchase agreement of charging for engineering support,
20 correct?
21 A  That's correct.

Page 117

1  Q.  And in this email AMBI is also committing
2  to providing SAC with manufacturing engineering
3  support, correct?
4  A  That's correct.
5  Q.  And there's no mention there of charging
6  SAC for that manufacturing engineering support,
7  correct?
8  A  Not in this email.
9  Q.  And there's nothing in the patent purchase
10 agreement that indicates that SAC would be charged for
11 manufacturing engineering support, correct?
12 A  Correct.
13 Q.  This email also provides that SAC will get
14 recommended tooling, fixture design and program process
15 support from AMBI, correct?
16 A  That's correct.
17 Q.  And there's no mention of charging any
18 amounts for that tooling, fixture design, and program
19 process support, correct?
20 A  In this email, that's correct.
21 Q.  And there's nothing in the patent purchase

30 (Pages 114 - 117)

Page 118

1  agreement --
2      A    That's correct.
3      Q.   -- reflecting charging for those services,
4  correct?
5      A    Correct.
6      Q.   And in fact there's not a single
7  communication between the parties where AMBI indicates
8  that it was charging or planned on charging SAC any
9  amounts for any of the support it was providing to SAC,
10 correct?
11     A    In this writing, no.  But in face-to-face
12 with Jose, yes.
13     Q.   Did AMBI ever send an invoice to SAC for
14 any engineering support, manufacturing engineering
15 support, product engineering support, or tooling,
16 fixture design, and program process support?
17     A    No, we didn't.
18     Q.   You mentioned a conversation with Jose
19 where you talked about charging for support; when was
20 that conversation?
21     A    The conversation was the day of the demo,

Page 119

1  which would have been April 23rd.  After the demo Jose
2  took me through the shop, explained his production
3  woes, his list lack of production, and asked me to help
4  them with the production of a lot of their components.
5      Q.   April 23rd of what year?
6      A    2018.
7      Q.   So that was the first time you had been to
8  SAC?
9      A    Correct.
10     Q.   It's prior to this email, correct?
11     A    Prior to this email, yes.
12     Q.   Prior to execution of the patent purchase
13 agreement, correct?
14     A    Correct.
15     Q.   And what did you say to Jose with regards
16 to charging for engineering support?
17     A    I stated to Jose that if he buys my patent
18 I will gladly help him with product support.  I did not
19 say I would charge him.  I did not give him a price.
20 All I said was I would help SAC with their processes.
21     Q.   Was there any other conversation with Jose

Page 120

1  or anybody else at SAC about the provision of support?
2      A    No, sir.
3      Q.   Okay.  So in that April 23rd meeting you
4  did not indicate that AMBI would charge for product
5  support correct?
6      A    No, sir, but I told him I would give him
7  that support if he bought the patent.
8      Q.   And so now you believe that AMBI is
9  entitled to full payment on the amounts identified in
10 the patent purchase agreement as well as the amounts
11 for providing engineering support?
12     A    I do.
13     Q.   Okay.  Why?
14     A    Why?  Because they're using that
15 technology.  I gave them technology on parts that
16 they're running in production today.
17     Q.   Well, how do you know they're running it on
18 production today?
19     A    Well, believe me, I gave them this stuff
20 and they were working on the machines, having fixtures
21 built.  Now, I don't actually know that they're using

Page 121

1  the stuff to this moment but I do know that I sat down
2  with their machinist, their setup guys.  I sat down
3  with Jack and transferred files, tombstones, fixtures,
4  hardware, processes, where to cut, when to cut, what
5  tools to use.  They were manufacturing upper receivers
6  at one per every 90-minute, and my process gave them a
7  process to manufacture six in their 90-minute
8  timeframe.
9      Q.   Manufacture what?
10     A    Upper receivers for the AR-15 and the
11 AR-10.
12     Q.   So this engineering support that you
13 provided was separate and different from engineering
14 support for the gas piston system?
15     A    That particular was, yes.
16     Q.   And you also provided engineering support
17 for the gas piston system, correct?
18     A    Yes, sir.
19     Q.   Is any of that included in what you're
20 demanding in this complaint?
21     A    Yes, sir.

Page 122

1  Q.  Was that a yes?
2  A  Yes, sir. I'm sorry if you didn't hear me.
3  Q.  Yeah, thank you. So you believe that
4  you're entitled to full payment of the patent purchase
5  amount plus over $200,000 for all the engineering
6  support you provided?
7  A  Yes, sir.
8      (Brown Exhibit 11 was marked for purposes
9  of identification.)
10 Q.  Okay. I would like you to take a look at
11 Exhibit 11. That is an email that you sent to Mr.
12 Kalua on or about August 25th, 2018?
13 A  I agree with that.
14 Q.  Yeah, and you were sending the signed
15 agreement to him, correct?
16 A  Correct.
17 Q.  What did you mean when you say "No let's
18 make SAC the industry leader"?
19 A  That's me being quick and foolish of not
20 putting a W on the end of that. "Now let's make SCA
21 the industry leader." I do that quite often.

Page 123

1  Q.  We all do. What did you mean when you
2  said, "Now let's make SAC the industry leader"?
3  A  They bought a very good patent which should
4  upgrade their product.
5  Q.  What product, when you say it should
6  upgrade their product, what product?
7  A  Their rifle line. I mean whatever the
8  piston system would go on.
9      (Brown Exhibit 12 was marked for purposes
10 of identification.)
11 Q.  Would you take a look at Exhibit 12. Do
12 you recognize this email?
13 A  I do recognize this.
14 Q.  For the record it's Bates numbered AMBI
15 1263 and it's an email from you to Mr. Kalua on October
16 12th, 2018. Would you agree with that?
17 A  Yes, sir.
18 Q.  It references a sample scaled-down piston
19 assembly. What is that?
20 A  Assemblies, it's two of them, that I sent
21 them. They are the same exact system of the original

Page 124

1  patent. They are just reduced on the outside perimeter
2  to clear SAC's handguard, or I should say Armalite
3  handguard, at that point.
4  Q.  So at that point you knew that SAC intended
5  to use its standard handguards?
6  A  At that point, yes.
7  Q.  Who informed you of that?
8  A  I did.
9  Q.  Who informed you of SAC's intent to use
10 their standard handguards?
11 A  They, when I was there they shot me two
12 samples and then they asked me if I would assemble the
13 piston bases of the piston samples on their rifle. So
14 I put the piston bases on their rifle, attached them,
15 did the machine work, and assembled them.
16     And then, they shot them like that, then
17 when we went to put the handguard on they then showed
18 me the handguard that went to that, and when we went to
19 put it on we found an interference to it. So the 17th,
20 or it might have been the 18th, somewhere around there,
21 in that trip, before, I was there for a week, somewhere

Page 125

1  around in that date is when I first learned what
2  handguard, what gun, learned everything.
3  Q.  And when you say 17th or 18th, you're
4  referring to September of 2018?
5  A  Correct.
6  Q.  So, you go back to AMBI's facilities and
7  you scale-down the piston assembly system?
8  A  That's correct.
9  Q.  And you send it to -- well, who do you send
10 it to?
11 A  First, I want to believe, that I sent it
12 concurrently, I want to believe that I told Jason about
13 it, and sent, I think maybe sent Jack Oliver a copy of
14 it. But that was in September that, you know, that I
15 actually made the changes to the drawings and basically
16 started this new scaled-down folder, but actually this
17 email follows up when the actual components were
18 finished, before they went out to heat-treating and
19 plating.
20 Q.  Were the components ultimately sent to SAC?
21 A  Yes, they were. I kept one for myself to

32 (Pages 122 - 125)

Page 134

1  from.
2  Q. Got it. I understand. You tried to
3  redesign, well, what did you redesign in, that you're
4  referring to in Paragraph 3?
5  A  First of all, when I was out there, when it
6  hit and they didn't want to, they didn't want to modify
7  the handguard, which was, I was fine with. So what I
8  did was I took the two guns that I had assembled the
9  with the piston systems on it, that fit everything,
10 minus the handguard, I milled three flats on them so
11 that they would clear the handguard. Them two systems
12 now cleared their standard handguard. We took them
13 systems and we took them into the Snail Room, which is
14 a little test facility to shoot into, and we shot them
15 guns.
16 Q. And it didn't work?
17 A  No, it worked.
18 Q. Oh, okay. Well, you say here that they
19 didn't function the same?
20 A  No. No, no, that's not, that's not what's
21 talking. I suggested piston system fits most rails, I

Page 135

1  returned back to AMBI and designed three reduced
2  assemblies. "They would need testing and adjustments
3  to make them function."
4      No, what that means is when I came back to
5  AMBI and I designed the scaled-down version, okay,
6  which becomes a smaller outside diameter, to keep the
7  same wall thickness, the inside diameter is reduced
8  now, once you start changing diameters, it's no
9  different than a motor in a car or piston size, you
10 wind up getting more torque, you wind up getting more
11 energy out of something bigger, and you lose energy on
12 something smaller. So the way you govern that is, is
13 you now, you have to open up gas holes and require a
14 little more gas to get the same motion and effect.
15 Q. And ultimately it didn't function the same?
16 That's all I'm trying to get to?
17 A  No, it functioned the same, you just needed
18 more gas. You had to open the gas up more. What I was
19 trying to say is you can't expect for something
20 smaller, you can't expect to take a V-8 out of a car
21 and put a 6 cylinder in there and expect it to have the

Page 136

1  same horsepower performance. You have to, you might
2  have to, to get the same performance that you have to
3  feed it more fuel. This is the same thing with this
4  littler system. You have to open up the gas hole to
5  get more pressure.
6  Q. So moving down to Page 11, to Bates
7  numbered AMBI 917.
8  A  Yes, sir.
9  Q. You indicate here that you were asked by
10 SAC to help with the manufacturing process for the
11 upper receivers, that you developed a process, that you
12 provided CAD solids and prints of tombstones and
13 fixtures for the horizontals, and that that was done
14 free of charge, right?
15 A  Yes, sir.
16 Q. And you never sent an invoice for that
17 work, did you?
18 A  No, sir.
19 Q. And similarly the other services that you
20 identify on AMBI 918 regarding the rail, handguard and
21 barrel nut package, the piston design bolt carrier, and

Page 137

1  development of the prototypes, those were all done free
2  of charge, correct?
3  A  Yes, sir.
4  Q. And you never sent an invoice for that,
5  correct?
6  A  That's correct.
7  Q. And are you seeking payment for those
8  services now in this case?
9  A  Yes, sir.
10 Q. You then say on Page 12, which again is
11 AMBI 918, about middle of the way down the page, "I
12 spoke with Jason on 6/01/2019 at 12 p.m. to see what
13 was going on with the project." Had you heard much
14 about the project in between October of '18 when you
15 were out at SAC and June of '19?
16 A  Yes, sir. I inquired Jason on four, five
17 times, and I was hold that it was on schedule. I met
18 with everybody at SAC that was at SHOT Show of 2019,
19 January 20th of 2019. Not one person, I asked
20 everybody, "How is the project going?" "Oh, it's going
21 good." This is at SHOT Show with the owner, with

Page 138

1  everybody that was involved, not one, not one mention
2  of any issues, and project was on target.
3      Q.   Were any of these communications where you
4  sought information or where SAC provided information in
5  writing?
6      A.   No, sir.  Phone calls and in-person.
7      Q.   You say you "spoke with Jason on 6/01/2019
8  at 12 p.m. to see what was going on with the project
9  and I told him about Jose's email on June 1."
10     A.   Correct.
11     Q.   "Stating the piston system was still not
12 working."
13     A.   Correct.
14     Q.   What did Jose say about the system not
15 working?
16     A.   First of all, Jose said the system was not
17 working.  When I questioned him, and I said, what do
18 you mean not working, I said I know that, I was told
19 that there was test reports and videos and things
20 working.  You know, goes, he changed it from not
21 working to not in production, and they weren't up to

Page 139

1  running them in production.
2      Q.   Did he say why they weren't running them in
3  production?
4      A.   He didn't know.  He was asking me what was
5  up with the project, which I found crazy because nobody
6  was talking to me anyway.
7      Q.   Did Jose mention anything else during that
8  call?
9      A.   Well, he, like I said, he mentioned about
10 first saying that it wasn't working, then they weren't
11 working, and then he asked me if I would help him get
12 this into production or fix the problems.  That's what
13 I can remember.
14     Q.   What did you say?
15     A.   I told him I would definitely come out
16 there.  I had my interest in his company.
17     Q.   And why did you have an interest in his
18 company?
19     A.   I wanted them to be successful.
20     Q.   And you weren't going to make any more
21 money whether or not they were successful or not,

Page 140

1  right?
2      A.   No.  But it's so-called my AMBI, my design
3  that I wanted it to be successful.  I don't want it to
4  be where it just sits in a closet.
5      Q.   Well, and in fact you had committed to
6  providing engineering, product engineering and
7  manufacturing support as part of the agreement, right?
8      A.   Yes, sir.
9      Q.   And at that point, at least, they were
10 still paying you the money, correct?
11     A.   That's correct.
12     Q.   I want you to take to you Page 22 of this
13 document, which is Bates numbered AMBI 928.
14     A.   Go ahead.
15     Q.   Did you ever provide this list to SAC?
16     A.   No, sir.
17     Q.   Did you develop this list?
18     A.   I developed a list of what I know that I
19 used and what also the competitor that was within my
20 dimensions used.  I might have told Jack this, in that
21 November, you know as I was trying to work with him.

Page 141

1  I'm not sure.  But definitely the only person I would
2  have ever said that the way it fit was Jack or my
3  counsel.
4      Q.   When did you prepare this list?
5      A.   In June.  This was well after the Wanderley
6  phone call, of the, where they all started.
7      Q.   Why don't you tell me about that phone call
8  with Wanderley.
9      A.   Yes, sir.  I was messaged by Jack.  I don't
10 know if it was messaged or email, but somewhere along
11 the line I was messaged by Jack.  And he said that
12 would you have a phone call, would you be willing to
13 take a phone call with Wanderley.  I said of course I
14 would.  And I got the phone call and I'm trying to find
15 the date and the time.  I know it was June 10th, so
16 let's call it, okay, I see it now, 5:55 p.m., Wanderley
17 calls me and he --
18     Q.   What are you looking at?
19     A.   I'm looking at your Page 12, the last five
20 or six lines back down there.  I received a phone call
21 from Wanderley.