# EXHIBIT 1

Page 1

1        UNITED STATES DISTRICT COURT FOR THE

                DISTRICT OF MARYLAND

2              (Northern Division)

3

4    AMBIMJB, LLC                    * Civil Case No.:

                                       1:20-cv-00807-JKB

5       Plaintiff/Counter-Defendant  *

6    v.                              *

7    STRATEGIC ARMORY CORPS, LLC     *

8       Defendant/Counter-Plaintiff  *

9    *       *       *       *       *       *

10      VIDEOCONFERENCE DEPOSITION OF DAVID M. LAUCK

11                  EXPERT WITNESS

12              BALTIMORE, MARYLAND

13              SEPTEMBER 25, 2020

14

15

16   Reported by Kathleen E. Manes, Court Reporter

17

18

19

20

21

Page 30

1   A   I can't put a number on that.
2   Q   You also identify protective
3   services. What do you mean by protective
4   services as -- as the nature of services that
5   you provide?
6   A   If say, for example, I'm contacted by
7   individuals who are concerned about personal
8   security, I'll give them advice on (inaudible).
9       THE COURT REPORTER: Advice on what?
10  Sorry. Advice on what?
11      THE WITNESS: Advice on personal
12  security.
13      THE COURT REPORTER: Thank you.
14  Sorry.
15      THE WITNESS: And if I am asked, you
16  know, to travel and see somebody in person to
17  look at their defensive structures or potential
18  defensive response they have in place and
19  advise them, I'll do that. But that -- that is
20  not normally a main part of my business because
21  I generally refer that to other people.

Page 31

1       BY MR. DORSEY:
2   Q   We're going -- we'll get into your --
3   your report a little while -- in a little bit.
4   You can pull it if you want. It's not an
5   exhibit as of yet. But I'm going to circle
6   back to the expert witness services that you
7   provide. But in your report, you identify five
8   cases in which you served as -- as an expert
9   witness in the prior four years. So let me --
10  let me introduce it.
11      MR. DORSEY: We're going to introduce
12  your report as Exhibit 3 for the record.
13      (Lauck Deposition Exhibit No. 3 was
14  marked for identification.)
15      BY MR. DORSEY:
16  Q   Do you have your report in front of
17  you?
18  A   I do but I have not located that page
19  yet.
20  Q   Okay. It's on the final page of your
21  report, the text of your report, under Section

Page 32

1   T, as in Tom.
2   A   Okay. Got it.
3   Q   Got it? Okay. The first case is
4   dated you say 2016 is the Bertram ex-police
5   chief shotgun shooting death, slash, murder
6   case, Winner, South Dakota.
7       Do you see that?
8   A   Yes, sir.
9   Q   Is that case still active?
10  A   I was contacted again about that case
11  just a month or two ago where they said there
12  was some activity in the case, so that's what I
13  know.
14  Q   Prior to being contacted within the
15  last month concerning the Bertram case, when is
16  the last time before that you actually did work
17  on that case?
18  A   Oh, it's probably been at least a
19  couple years ago since I had talked to the
20  involved attorneys.
21  Q   Okay. The next case is also dated

Page 33

1   2016 and it says Speckmier police -- police
2   shooting case in South Dakota.
3       Do you see that?
4   A   Yes, sir.
5   Q   When is the last time you provided
6   services on the Speckmier police shooting case?
7   A   It would have been probably roughly
8   2016. That case pled out before it went to
9   court.
10  Q   And the next case is the 2018 Schmitz
11  murder case in Lake County, South Dakota. When
12  is the last time you provided expert witness
13  services on the Schmitz murder case?
14  A   Probably in that '18, '19 era. And
15  he pled out as well.
16  Q   And next case you identified, 2019
17  Pfeiffer shooting death case, Hill City, South
18  Dakota. When is the last time you provided
19  expert services on Pfeiffer the shooting death
20  case?
21  A   That is still ongoing. And I believe

Page 34

1  I talked to the attorney on that roughly three
2  or four weeks ago, just on the telephone.
3      Q   And the last case you identify is the
4  2019 Krause police shooting death case, top --
5  Topock, Arizona.  When is the last time you
6  provided services on the Krause police shooting
7  death case?
8      A   Probably in 2019.
9      Q   So I don't see you identifying -- you
10 haven't identified the current case, the AMBI
11 versus SAC.  Correct?  You don't identify --
12 you don't identify this case on your final page
13 of your report.  Correct?
14     A   Correct.
15     Q   So we know you're designated a
16 witness -- an expert witness in this case.  So
17 you have the AMBI case and you have the
18 Pfeiffer shooting death case as the only two
19 active cases in which you're involved as an
20 expert witness?
21     A   That's -- that's what I recall off

Page 35

1  the top of my head.
2      Q   You can turn back to your CV for me.
3  Or grab your CV again for me.  Are you there?
4      A   Yes, sir.  Go ahead.
5      Q   Okay.  As far as -- as far as your
6  educational background is concerned, your --
7  your CV provides you have a high school.  Is
8  that correct?
9      A   Yes.
10     Q   Did you attend college or any type of
11 vocational school after high school?
12     A   I did not -- I do not have a college
13 degree.  I did attend training at three police
14 academies, was a certified officer in two
15 states and a state agent in a third state and
16 received education and training on gunsmithing
17 and armory work from numerous places.
18     Q   Tell me about the training you
19 received on gunsmithing.  When -- tell me about
20 that -- that training.
21     A   I received gunsmithing and armorers

Page 36

1  training from Colt, HK, Smith & Wesson, CNS,
2  AGI, Remington, and Glock that I recall off the
3  top of my head.
4      Q   Okay.  What -- what is gunsmithing or
5  what does gunsmithing mean?
6      A   Basically a person that works on
7  guns.
8      Q   What is an armorer?
9      A   An armorer.  There's different levels
10 of armorers.  There's a basic, say an armorer
11 in a police department that does basic
12 cleaning, basic repairs, basic maintenance,
13 basic advice to the officers.  And then there's
14 advanced armory work that gets more into
15 gunsmithing, more involved work.  And as you
16 get into the level of advanced gunsmithing, you
17 know, you're making your own parts and
18 customizing and designing improvements for
19 firearms.
20     Q   Would you consider yourself an
21 advanced gunsmith?

Page 37

1      A   I was voted American pistol Smith of
2  the year by my peers in the field, so yes.
3      Q   Okay.  Are you a licensed gunsmith?
4      A   Yes.  I'm a federally licensed actual
5  gun manufacturer.
6      Q   Isn't that a little different than
7  being a licensed gunsmith?  Do you -- do you
8  hold a license from any government agency that
9  designates you as a licensed gunsmith?
10     A   I'm not aware that such a license
11 exists.  I'm a federally licensed firearms -- I
12 hold a federal firearms license.  And mine is
13 rated at manufacturing level.  So I don't know
14 any license that says you're a gunsmith like a
15 driver's license.
16     Q   Your law enforcement background
17 27 years frontline active duty from 1979 to
18 2006.  Tell me the state in which you were a
19 frontline police officer.
20     A   South Dakota, Montana, and Wyoming.
21     Q   Why did you retire as a police

Page 38

1 officer?
2  A   Why didn't I retire?
3  Q   Yeah.
4  A   I actually confronted police
5 misconduct inside the profession, racism,
6 dereliction of duty, excessive force and that
7 kind of thing. I received retaliation from the
8 sheriff who wanted me to lie for him and in
9 police reports. And I refused to do it.
10  Q   And you filed a lawsuit against
11 Campbell County. Is that correct?
12  A   I did.
13  Q   Are you -- are you a named investor
14 on any -- on any patents?
15  A   I hold no patents.
16  Q   Have you ever applied for a patent?
17  A   I -- I know I looked into it at one
18 time or had a person look into it, and it
19 was -- I considered it too much time and
20 expense to go forward on because of the way the
21 firearms industry develops so fast.

Page 39

1  Q   What do you mean by that?
2  A   That -- you mean the part about time
3 and money?
4  Q   No. About -- about the firearms
5 industry progressing so fast. What do you mean
6 by that?
7  A   Well, I mean the advancements in the
8 firearms field are so quick that what's new
9 today is old tomorrow. And you're on to
10 different designs and different improvements on
11 a very quick time frame.
12  Q   On page 3 of your CV, you state that
13 highly rated expert witness for high-profile
14 cases involving firearms and tactics-related
15 matters. How -- and how did you -- and how did
16 you come to characterize yourself as highly
17 rated?
18  A   Ratings I received from prosecutors,
19 from attorneys, and fellow officers in the
20 police field that evaluated my performance.
21  Q   When you say "high -- "high-profile

Page 40

1 cases involving firearms," and generally,
2 that's just a general statement involving
3 firearms, tell me about some of those cases.
4  A   Tell you about some of what?
5  Q   You said "high-profile cases
6 involving firearms." Give me an example case
7 of a high-profile case involving firearms in
8 which you were involved.
9  A   Okay. Say, for example, the I-90
10 sniper incident where a shooter was shooting at
11 citizens driving down the interstate, I-90, and
12 eventually shooting a person; or I don't
13 remember if it was more than one person, but he
14 was shooting at multiple people and he hit at
15 least one. I took that case through two trials
16 and obtained a conviction based upon firearms
17 and ballistics.
18  Q   Prior to your involvement in this
19 case, have you ever been designated an expert
20 witness related to a patent issue before?
21  A   No.

Page 41

1  Q   So you've never given an expert
2 opinion on the invalidity of a patent. Is that
3 correct?
4  A   Correct.
5  Q   And prior to this case, you've never
6 given-- or you never given an opinion
7 concerning the validity of a patent. Is that
8 correct?
9  A   This is my first patent case.
10  Q   Were you aware of the term of
11 obviousness in the patent realm prior to your
12 involvement in this case?
13  A   Yes.
14  Q   How -- how were you aware of the term
15 of obviousness in the relation to patents prior
16 to your involvement in this case?
17  A   Well, as I mentioned I looked into
18 patenting my own products in the past and
19 talked with people who claimed they were patent
20 experts and picked up some of the statements
21 from them.

Page 50

1  than what's in his report or -- or does what's
2  in his report also count?
3       MR. DORSEY: It depends on what his
4  answer is. I mean, I'm just trying to get an
5  understanding as to what -- what -- what he did
6  and how he went about --
7       MR. TILLER: Well, you're trying --
8       MR. DORSEY: -- carrying it out.
9       MR. TILLER: You're trying to get
10 him --
11      MR. DORSEY: I don't -- I don't
12 think -- the deponent has not --
13      MR. TILLER: You're trying to get
14 him --
15      MR. DORSEY: I understand --
16      MR. TILLER: -- to memorize what's in
17 his report. And obviously --
18      MR. DORSEY: That's not what I'm
19 trying to get him to do. And he has not -- the
20 deponent has not suggested to me that he didn't
21 understand my question or was not able to

Page 51

1  proceed to answer my question. So I mean --
2       MR. TILLER: And, Greg -- and, Greg,
3  I have a -- I have a right -- I have a right to
4  clarify the question. And obviously, you know,
5  it seems like you're asking him to engage in a
6  memory contest. If not, that's fine.
7       MR. DORSEY: Well, that's not what
8  I'm asking him to do.
9       BY MR. DORSEY:
10    Q    Did you understand my question,
11 Mr. Lauck?
12    A    One more time, please.
13    Q    You stated that you looked at the
14 Brown patent. And we were talking about the
15 method of operation and what -- what you did to
16 look into that. And you mentioned forward
17 venting gas had been out there prior to the
18 date of the Brown patent. What other feature
19 or function or operation of the Brown patent
20 were you looking into other than the forward
21 venting gas component?

Page 52

1    A    Well, how the gas -- pardon me -- did
2  I interrupt?
3    Q    No. Go ahead.
4       MR. TILLER: No. Go ahead.
5       THE WITNESS: Okay. How the gas
6  vents forward is also an important feature and
7  that has to do with the central passageway of
8  the system. The central passageway of a
9  piston-operated firearm has also been out there
10 years before the Brown patent. And so has the
11 occluded passageway been out there years before
12 the Brown system. So I didn't see anything
13 that was new. The ring chamber, that I believe
14 you may call it the annular chamber, is also
15 nothing new. The idea of a ring chamber, a
16 central passageway, and forward venting gas is
17 not new. It's years old.
18    Q    How long did it take you -- take you
19 to investigate or perform your investigation
20 into the Brown patent?
21    A    Well, it's been ongoing for several

Page 53

1  months ever since I was retained.
2    Q    Okay. Well, your report is dated
3  December -- I'm sorry -- June the 24th. I can
4  confirm. Hold on. It's dated -- I'm sorry --
5  June 1st of 2020. So prior to June 1st of
6  2020, how long did it take you to investigate
7  the Brown patent?
8    A    Well, I believe I was not only
9  reviewing the Brown patent, similar patents,
10 and other products in the firearms industry
11 over a period of months.
12    Q    During your investigation did you
13 speak with anyone?
14    A    I'm sure that I did.
15    Q    Who did you speak with?
16    A    Mr. Tiller, Mr. Tiller's partner
17 named Berry. Those would be the two attorneys
18 on the case. And nobody else comes to mind.
19    Q    During your investigation I take it
20 you reviewed documents. Correct?
21    A    Yes.

Page 54

1   Q   Can you identify the documents you
2   reviewed?
3   A   Many different patents. Those would
4   be the main documents. That's what comes to
5   mind.
6   Q   Okay. So you mentioned "many
7   different patents." Your report identifies
8   several patents. Do you recall reviewing any
9   patent that has not been identified in your
10  report?
11  A   Sure.
12  Q   Do you recall --
13  A   I scan --
14  Q   I'm sorry?
15  A   I scan -- excuse me. I scanned
16  through numerous patents looking for the things
17  that would best demonstrate what I was trying
18  to educate the attorneys about.
19  Q   Prior to reviewing any documents in
20  this case, had you concluded that the -- had
21  you formed an opinion as to whether the Brown

Page 55

1   patent was obvious?
2   A   I believe I did.
3   Q   Okay. What led you to conclude that
4   the invention rela- -- related to the Brown
5   patent was obvious prior to reviewing any
6   documents in this case?
7   A   It was -- I believed it was very
8   probable that it was obvious before I got into
9   patent work or the patent documents because of
10  the descriptions I was hearing from either IMS
11  or the attorneys or both that the -- one of the
12  primary claims was exhausting gas out the front
13  of the gun through a central passageway. I had
14  invented that myself years prior, so it was no
15  surprise.
16  Q   So based solely on the description of
17  the Brown patent by other counsel or the expert
18  referral services that connected you with
19  counsel, you had a preliminary opinion that the
20  Brown patent was in fact an obvious -- the
21  invention was obvious?

Page 56

1   A   That it was probable that it was
2   obvious.
3   Q   During your investigation in this
4   case, did you perform any tests of the AMBI gas
5   piston system?
6   A   Yes.
7   Q   Tell me about that.
8   A   I received two upper receivers and
9   one complete firearm from the FAC Company for
10  inspection and testing. And those are the
11  devices that I inspected for this case.
12  Q   Can you describe the -- you said two
13  upper receivers. Were the upper re- -- what
14  type -- type of -- was it an SAC upper
15  receiver? Do you know whether it was a
16  manufactured SAC firearm?
17  A   Well, the one that came with the
18  lower receiver attached had an AMBI designation
19  on it.
20  Q   And what was the result of your tests
21  or evaluation of -- of the two upper receivers?

Page 57

1   A   I thought the work was very crude. I
2   thought the gas piston was very crude. If
3   somebody brought that in to me to sell or
4   trade, I wouldn't even accept it. I inspected
5   them to the point where I checked the head
6   space on all three upper receivers. I test
7   fired two of the upper receivers. And one
8   would not function at all even though I gave it
9   10 opportunities to cycle. And then the other
10  one which was the carbine length one did in
11  fact function. And they were all the
12  Brown-style piston system.
13  Q   So that the carbine one was Brown --
14  let me -- let me just understand. So you said
15  one you test fired and one would not function
16  at all. Describe what you test fired?
17      First of all, do -- do you still have
18  the --
19  A   The one that would not funk --
20  Q   First of all, do you still have those
21  components?

Page 58

1  A   No. They were returned to SAC.
2  Q   Do you recall when you received those
3  two upper receives from SAC?
4  A   I do not recall the date, but it's --
5  it's recorded in case documents. The -- the
6  whole package was photographed and dated and et
7  cetera when it arrived and documented when it
8  shipped back.
9  Q   Do you recall as far as your testing
10 is concerned, did you document your test
11 results?
12 A   Yes.
13 Q   Did you turn those test results over
14 to counsel?
15 A   I believe so.
16 Q   You referred to the product that you
17 tested as being crude. What do you mean by
18 that?
19 A   Crude, substandard, like a -- when I
20 first took the -- the piston out, it looked
21 like something that a -- would come out of a

Page 59

1  high school shop. It was that crude. It
2  looked like it was filed upon, rough,
3  unfinished. Nothing like that would be
4  acceptable coming out of my shop.
5  Q   Do you know whether anyone at SAC had
6  done any work or modifications to those items
7  prior to you receiving them?
8  A   I do not.
9  Q   Did you ask?
10 A   I did not.
11 Q   Why not?
12 A   I tested them as they were received
13 and I documented my tests from that point. I
14 figure other witnesses would be able to inform
15 the Court or the jury at what point the
16 modifications were made.
17 Q   As far as documenting your testing
18 and your test results, what does that --
19 what -- what did you -- what do those -- what
20 do those documents look like?
21 A   They -- the products were

Page 60

1  photographed and retained on disc. And the
2  test fire was done at a live fire range. And
3  the head space was checked and found to be
4  good. And that information was documented in a
5  written report.
6  Q   Are you -- a report other than the
7  expert report that is your Exhibit No. 3?
8  A   Yes. Just a single-page report of
9  testing of those items.
10 Q   Okay.
11     MR. DORSEY: Mr. Tiller, do you know
12 whether that report has been turned over and
13 produced in this case?
14     MR. TILLER: The first I'm hearing of
15 it.
16     MR. DORSEY: Okay.
17     BY MR. DORSEY:
18 Q   Mr. Lauck, I'm going to ask you to
19 find that report. And to the extent you've not
20 already turned it over to counsel, I'll ask you
21 to forward that report to counsel and I'll ask

Page 61

1  counsel to turn that report over to me.
2  A   No problem.
3     MR. TILLER: We'll -- we'll consider
4  it.
5     MR. DORSEY: My hope is that counsel
6  will not only consider the request but will
7  follow through on me -- my request for a
8  document that the expert witness has testified
9  that he created in support of his -- let me --
10 let me ask the witness.
11     BY MR. DORSEY:
12 Q   Mr. Lauck, the test results that you
13 referenced that are documented, did you rely
14 upon those results in rendering your -- the
15 opinions that you're expressing in this case?
16 A   In part, yes.
17     MR. DORSEY: And, Counsel, I will ask
18 that it be turned over.
19     MR. TILLER: We'll consider it.
20     BY MR. DORSEY:
21 Q   I don't want to digress too much,

Page 70

1  A   I was prepared to, yes.
2  Q   And on Page 8 of the Exhibit 4 the
3  Court goes on to write, "Lauck made no
4  measurement or calculation to support his
5  conclusion. His investigation is completely
6  devoid of scientific analysis for which he is
7  unqualified to conduct."
8      Do you see that?
9  A   I see it. It's not accurate.
10 Q   The Court concluded, "Finding Lauck's
11 general firearm's expertise inadequate to
12 support his opinions regarding bullet
13 trajectories, and conclusions derived thereof,
14 the Court will exclude Lauck's testimony on
15 this topic."
16     Did I read that correctly?
17 A   You read it correct.
18 Q   It goes down to the summary of the
19 Court's opinion, which on page 14 of Exhibit 4.
20 Under Line 17, "To summarize, Lauck's opinions
21 are subject to the following limitations and

Page 71

1  exclusions: The Court will not consider
2  Lauck's opinion that Krause was shot while
3  inside his residence. Not only was his opinion
4  untimely and excludable under Rule 37(c), Lauck
5  is not -- Lauck is unqualified to make it.
6  Lauck is no expert in ballistics and is
7  unqualified to conduct bullet trajectory
8  analysis. To the extent his test -- his
9  opinions rely on that analysis, his conclusions
10 regarding the physical locations and
11 orientations of Krause and Selmanson are
12 excluded. Further, the Court will exclude
13 statements of a legal conclusion identified in
14 this order. That said, in some -- in some
15 arenas, Lauck's opinions are perfectly
16 acceptable and are likely to assist the finder
17 of fact. The Court finds Lauck generally
18 qualified as a police practices and use of
19 force expert. Insofar as his opinions draw
20 from such experience, they're allowable.
21 Specifically Lauck's testimony regarding

Page 72

1  defendants alleged violations of MCSO policies
2  and the appropriateness of their conduct in
3  light of both of those policies and accepted
4  police is permissible."
5      So the Court pretty much excluded a
6  large portion of the expert testimony you
7  intended assert in the Krause case. Is that
8  correct?
9      MR. TILLER: Objection.
10     BY MR. DORSEY:
11 Q   Is that correct?
12 A   I -- I don't know if you'd qualify it
13 as a large portion. I know it's in
14 disagreement with District Court of Wyoming
15 where I testified as an expert on ballistics.
16 And as far as medical services, when officers
17 shoot a citizen and he's dying on the ground,
18 they're obligated to provide him medical care.
19 And in this case the officer didn't do anything
20 but call medical services and offered him no
21 first aid on scene.

Page 73

1      If you think that's acceptable, you
2  and I are in disagreement.
3  Q   Okay. So in the Krause case, though,
4  you also came up with new opinions during your
5  deposition that you did not express in the
6  contents of your written report. Is that
7  correct?
8  A   That's correct.
9  Q   Despite the fact that you had before
10 you the same set of facts with your initial
11 report that you had before you at deposition
12 when you made those new opinions. Is that
13 correct?
14 A   They were newly discovered statements
15 that led to the new information being
16 expressed.
17     MR. DORSEY: Madam court reporter, we
18 can stop sharing my screen for now.
19     BY MR. DORSEY:
20 Q   Mr. Lauck, let's go back to your
21 report which is Exhibit 3 of your deposition.

Page 74

1   A   Ready. Yes.
2   Q   You ready? Can you turn to page --
3   go to Page 2 of your report.
4   A   Table of Contents?
5   Q   The Table of Contents. Correct.
6   A   Okay.
7   Q   If I go down the Table of Contents
8   you have your report, it kind of breaks down
9   what I should find in the -- in the meat of
10  your report. Is that correct?
11  A   Yes.
12  Q   All right. So in the narrative
13  report section you get into -- you start with
14  Section D, the Historical Developments. Is
15  that correct?
16  A   Yes.
17  Q   And if I go down, as I continue down,
18  if I go down to Q, as in Quincy, it says "Test
19  Firing Brown System."
20      Do you see that?
21  A   Yes.

Page 75

1   Q   I didn't find a Section Q in your
2   written report. Can you confirm that Section Q
3   does not exist in your written report?
4   A   I don't see it in the copy that I
5   have; although, I know it's a -- it's a
6   one-page section that I do have.
7   Q   So is there another version of your
8   report that has a Section Q within it?
9   A   I saw it yesterday. And it was just
10  a single page, so maybe it did not get
11  inserted.
12  Q   Is it -- does it have the Q
13  designation on -- on top of that or on that
14  page that you saw?
15  A   I don't know. But it is the test
16  firing report, a single page.
17  Q   And again, just I know we talked
18  about it earlier and I made the request for it.
19  Is it just prose or is it a table that shows --
20  shows something or pictures or what -- what
21  does it consist of?

Page 76

1   A   It's just text and it's available.
2   Q   Available, you have it right there?
3   A   No, I don't have it right here. But
4   I saw it yesterday.
5   Q   Could you turn to Page 4, Section B,
6   as in boy, of the report.
7   A   Okay.
8   Q   Does Section B accurately summarize
9   your invalidity opinion to express -- you
10  intend to express in this case?
11  A   Yes.
12  Q   And what did you conclude?
13  A   That the Brown patent was obvious to
14  people with reasonable skill in the art.
15  Q   And you generally mentioned the Brown
16  patent. How many claims make up the Brown
17  patent?
18  A   I would have to look at it to tell
19  you for sure.
20  Q   Is it your opinion that each and
21  every claim within the Brown patent results in

Page 77

1   an obvious -- was -- was obvious?
2   A   It was.
3   Q   Just with respect to those
4   conclusions, does your report contain all of
5   your analysis relative to support your
6   conclusion with respect to the obviousness of
7   the Brown patent?
8   A   Well, as we just discussed, it
9   appears the testifier section is not in here.
10  And apparently you don't have it. But I don't
11  think there's any way that any report can
12  contain the totality of my experience and
13  knowledge in the field that I consider.
14  Q   Well, what is missing in your -- what
15  is missing in your report that supports your
16  conclusion with regards --
17  A   I wouldn't say --
18  Q   -- to your -- with regard to obvious?
19  A   I would not say anything is missing.
20  I'm saying it's hard to put on paper over
21  40 years of knowledge and experience in the

Page 78

1 firearms field.
2 Q Did anyone advise you how to evaluate
3 SAC's claim of invalidity?
4 A No.
5 Q Did you make any assumptions in
6 evaluating the validity of the -- of the -- the
7 validity of the Brown patent?
8 A I did not.
9 Q Who drafted your report?
10 A I did.
11 Q Did you draft every word?
12 A Did I draft every word?
13 Q Yes.
14 A I received the legal -- the legal
15 standards from Mr. Tiller.
16 Q So other than Mr. Tiller, did anyone
17 else assist with the drafting of your report?
18 A I don't know if his partner, Attorney
19 Berry, was involved or not. But they would
20 have put forward the legal standards.
21 Q Okay. Well, let me -- just to be

Page 79

1 clear, just to identify that, can you go
2 through your report and we can go page by page
3 and just identify to me what was provided by
4 way of just the legal component of it versus
5 your prose and your test?
6 A Okay. The first page is mine. The
7 second page is mine. The third page starts
8 with A at the top, see the third page with A at
9 the top I'm sure that Mr. Tiller assisted with
10 the person of ordinary skill in the art,
11 basically the legal standard.
12 Q That would be in the fifth paragraph?
13 Starting with, "In this regard, I have been
14 asked" or starting, "In my opinion"?
15 A In my opinion would -- that would be
16 my paragraph. And let's see, I believe the
17 paragraph prior to that would be the legal
18 standard.
19 Q Okay.
20 A Down towards the bottom, counsel
21 provided the definition of obviousness of a

Page 80

1 patent covered by 103, and at the top of the
2 next page provided the legal standard at the
3 top of the next page.
4 Q Okay.
5 A Summary of opinions would be mine.
6 Obviousness of the inventions would be mine.
7 Historical background would be mine. Next page
8 would be mine. Next page would be mine. Next
9 page would be mine. Next page would be mine.
10 Next page is mine. Next page is mine. Next
11 page is mine. Next page is mine. Next page is
12 mine. On -- at the top of the next page, which
13 is 13B, it -- the information listed separate
14 or spaced apart there would be from the Adams
15 Arms. I believe it's from their manual.
16 Q Did you -- on -- on that point, did
17 you retype what you observed in the manual? Or
18 did you just pull it from the Adams manual and
19 place it here?
20 A I -- I'm not sure. I don't remember.
21 Q But your -- your testimony is that

Page 81

1 the text that's starts with "a short stroke
2 free floating piston system" is not text that
3 you wrote?
4 A Well, I believe it's probably what I
5 wrote in my report that came out of the Adams
6 manual or advertising that describes their
7 Adams Arm system.
8 Q Okay.
9 A Then the bottom section is mine. And
10 the next page is mine. The next page is the
11 photograph, that's mine. The next page with
12 Figure 15 photograph is mine. Next page is
13 mine. Next page is mine. Next page is mine.
14 The next page where it talks about claim chart
15 information, Mr. Tiller may have assisted with
16 claim chart information.
17 Q So can you just so we're on the same
18 page for the record, what -- what page are you
19 on?
20 A At the top of the page it starts with
21 "there is really no" -- actually, it's the last

1  page of the report dated June 1, 2020.
2      Q   Okay.
3          THE COURT REPORTER: Mr. Dorsey, when
4  we get to a good stopping point, may we take a
5  quick break?
6          MR. DORSEY: Okay. That's fine.
7          BY MR. DORSEY:
8      Q   In the text -- the text that reads,
9  "There are really no functional differences
10 between the sum total of the, quote/unquote,
11 prior art, parenthetically, the pre-2016
12 information I reviewed and which is discussed
13 in this report and the attached claim chart,
14 end paren, and the Brown '769 patent claim,
15 except that no one piece of information I
16 reviewed shows the entirety of what the Brown
17 '769 patent claims."
18         Is that your text or Mr. Tiller's
19 text?
20     A   I wrote it and Mr. Tiller provided
21 assistance on some of the wording.

Page 83

1      Q   Okay. Anything else?
2      A   Nope.
3      Q   Okay.
4      A   That's it.
5          MR. DORSEY: All right. We can go
6  off the record until 12:30. Is that good?
7          MR. TILLER: Yes.
8          (Recess taken -- 12:19 a.m.)
9          (After recess -- 12:30 p.m.)
10         BY MR. DORSEY:
11     Q   Mr. Lauck, if you can pull up the
12 Brown patent if you have that. For the record,
13 it's being introduced as Exhibit 5 to your
14 exhibit.
15         (Lauck Deposition Exhibit No. 5 was
16 marked for identification.)
17         MR. DORSEY: And, Counsel, for the
18 record, I'm using the Bates-stamped version of
19 it, which is your production SAC222 through
20 SAC231.
21

Page 84

1          BY MR. DORSEY:
2      Q   Do you recognize the document,
3  Mr. Lauck?
4      A   Yes. The one I have is the '769
5  patent.
6      Q   Okay. And the '769 patent, you refer
7  to in your report as the Brown patent. Is that
8  correct?
9      A   Yes.
10     Q   So just for clarification purposes,
11 if I were to refer to Exhibit 5 as the AMBI
12 patent or the '769 patent, we would understand
13 that we're referring to the patent that is the
14 subject of Exhibit 3 of your report. Is that
15 correct? Is that fair?
16     A   Yes. You have some kind of audio
17 feedback that's making it difficult to hear
18 you, but I got the gist of that.
19         (Discussion off the record.)
20         BY MR. DORSEY:
21     Q   Can you describe the technology or --

Page 85

1  or art that's relevant to the Brown patent?
2      A   You want me to describe the Brown
3  patent itself?
4      Q   Sure. You can start with that.
5  Sure. Go ahead.
6      A   Do you want me to read their
7  description? Is that what you want?
8      Q   No. Let's -- let's strike that.
9          I asked -- my -- my initial question
10 was, can you tell me what the technology or art
11 that's relevant to the Brown patent.
12     A   Piston drive technology for rifles,
13 carbines, with forward venting gas.
14     Q   And why do you believe that's the
15 technology or -- or art that's relevant to the
16 Brown patent?
17     A   Well, due to the history of the AR
18 system and being improved upgraded with the
19 piston drive system, the problems we had in the
20 past was top venting gas, side venting gas, and
21 bottom venting gas, all creating problems. So

Page 170

1  and Figure 17. Now the question is between
2  the --
3       MR. DORSEY: No, I -- I did that --
4       MR. TILLER: -- Brown patent --
5       MR. DORSEY: That was original
6  question 20 questions ago. That wasn't my last
7  question that I posed.
8       MR. TILLER: Greg, I would ask that
9  you wait until I'm done, and then you can have
10 all the time you want to finish. Or if you
11 want, I can just get off the call.
12      MR. DORSEY: Whichever.
13      MR. TILLER: But I will note again
14 the objection is the report speaks for itself.
15      BY MR. DORSEY:
16   Q   So the question again, Mr. Lauck,
17 where in your report do you identify the
18 differences between the prior art and the
19 Mr. Brown's patent?
20      MR. TILLER: Same objection.
21      THE WITNESS: Mr. Dorsey, I'd have to

Page 171

1  agree that the -- the report does speak for
2  itself. The claim chart where it talks about
3  the claims of the Brown patent and the
4  adjoining column shows other patents that cover
5  the topic at hand. I can't off the top of my
6  head point to any paragraph where I say what
7  all the differences are. I mean, that would be
8  a pretty large report if you're talking about
9  all the other systems out there.
10      (Lauck Deposition Exhibit No. 11 was
11 marked for identification.)
12      BY MR. DORSEY:
13   Q   So your rebuttal report has been
14 entered as Exhibit 11. Let me know when you --
15 you have your rebuttal report in front of you.
16   A   I have it.
17   Q   On Page 2 of your report, you refer
18 to Mr. Bartocci's report on Page 10 where it
19 says, "On Page 10 the Bartocci report discusses
20 the Brown patent."
21      Do you see that?

Page 172

1   A   I'm on the second page of my rebuttal
2  report.
3   Q   Correct.
4   A   And which paragraph?
5   Q   The second -- the second paragraph on
6  the second page where it starts with "On
7  Page 10."
8   A   Mine says page 14. It says Page 14,
9  Paragraph 45? Is --
10  Q   Oh, I was referring -- I'm sorry. I
11 was referring to the second page as the second
12 in the PD. So I guess it would be the first
13 page of your report after your cover page.
14  A   Okay. Okay. On Page 10.
15  Q   Correct. And you refer to
16 Paragraph 18 of Mr. Bartocci's report. You
17 state that the report states in part gas is
18 expelled through the front of the gas block in
19 a way which has not been done before. This
20 includes the combination of the way gas enters
21 the cylinder, remains pressurized,

Page 173

1  parenthetically, dwell or delay, end paren,
2  until the piston opens to a tube extending into
3  the piston head and dumps all gas in the
4  cylinder through the front of the gas block to
5  atmosphere. The invention deals with previous
6  issues from external piston systems such as gas
7  being directed into the shooter's face,
8  parenthetically, particularly when suppressed,
9  hot gas is not kicking up debris under the rife
10 when fired and hot gas is being directed
11 towards the shooter's hand under the hand guard
12 and in turn causing the hand guard to heat up,
13 period.
14      So you -- you respond in disagreement
15 to Paragraph 18 of Mr. Bartocci report. And
16 you -- you just addressed the previous issues.
17 You say, these previous issues had not been --
18 you disagree that these previous issues had not
19 been addressed in the art prior to the filing
20 of the application of the Brown patent. You
21 don't take issue, however, with how

Page 174

1 Mr. Bartocci describes the difference
2 between -- or -- or the unique way in which the
3 Brown patent expels -- gas is expelled through
4 the front of gas block. Correct?
5     A    Okay. If you take a look at
6 Figure 17, you can see that the central
7 passageway on my system is larger than the
8 central passageway on the gas control
9 regulator. When the system is pressurized, the
10 piston moves back because of brass -- or gas
11 pressure against the rear of the regulator.
12 That gets the system open before it's
13 depressurized by the gas escaping out the front
14 of the rifle.
15         And if you want another example of
16 that where the central passageway is occluded
17 until the gas piston moves to the rear and then
18 dumps gas out the front of the rifle, you can
19 look at your animation video about the HK16 and
20 G36 because that's what that system does.
21 Moving the piston to the rear before you

Page 175

1 depressurize is something that's required in
2 order to have the timing correct for the gun to
3 operate. It's not new.
4     Q    You don't write that in your rebuttal
5 report, that Exhibit 11. Correct?
6     A    Say it one more time, please.
7     Q    You didn't write that in your
8 rebuttal report, which is Exhibit 11. Correct?
9     A    It's difficult to put 40 years of
10 experience in a report --
11    Q    That's not --
12    A    -- that's a --
13    Q    -- my question.
14    A    -- few pages long.
15    Q    My question was, you didn't write
16 that --
17        MR. TILLER: Hey, hey, hey, hey, let
18 him answer -- let him finish his answer before
19 you interrupt him, Greg.
20        Please finish, Mr. Lauck.
21        THE WITNESS: I'm here to testify

Page 176

1 about my experience with the system. Not
2 everything can be put in a report, but, yes,
3 you are correct that specific statement that I
4 just made is not in the report.
5         (Lauck Deposition Exhibit No. 12 was
6 marked for identification.)
7     BY MR. DORSEY:
8     Q    Exhibit 12 is Mr. Bartocci's report.
9     A    I have that report.
10    Q    Okay. I'll direct your attention to
11 Paragraph 28.
12    A    Of which page?
13    Q    It's Paragraph 28 so it's on Page 12.
14    A    Okay. I've got it.
15    Q    Okay. Can you just read that for me
16 real quick? I just want to ask you a couple
17 questions concerning what's written there.
18    A    Do you want me to read 28 to you?
19    Q    No, no, no. You can just read it to
20 yourself.
21    A    Okay. Okay. Go ahead.

Page 177

1     Q    Mr. Lauck, Mr. Bartocci is replying
2 to your statement in your report where you
3 wrote, "Such persons of ordinary skill in the
4 art had enough knowledge that it would have
5 been obvious for such persons to put the pieces
6 together to produce the Brown '769 patent
7 invention."
8         Mr. Bartocci writes, I disagree with
9 this conclusion for two reasons. First, unless
10 you use the Patent-in-Suit as a guide,
11 parenthetically, hindsight, the prior art does
12 not provide any reason for combining the pieces
13 in the way the claims specified.
14        Do you agree with Mr. Bartocci's
15 statement as far as the first item is
16 concerned?
17    A    Not at all.
18    Q    And why not?
19    A    Because it was obvious problems that
20 resulted in people wanting to solve these
21 problems. It was gas being vented up to the

45 (Pages 174 - 177)