IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AMBIMJB, LLC,                            *

    Plaintiff,                          *

    v.                                  *

                                                      CIVIL NO. JKB-20-807

STRATEGIC ARMORY CORPS, LLC,            *

    Defendant.                          *

  *    *    *    *    *    *    *    *    *    *    *    *

**MEMORANDUM**

Plaintiff AMBIMJB, LLC ("AMBI") sued Defendant Strategic Armory Corps, LLC ("SAC") for breach of a Patent Purchase Agreement executed on August 24, 2018 (the "Agreement") and unjust enrichment. In response, SAC filed five contract-based counterclaims seeking rescission of the Agreement. AMBI has moved for summary judgment on its breach of contract claim and on all of SAC's counterclaims (AMBI Mot. Summ. J., ECF No. 43). AMBI has also moved to strike a supplemental report produced by Dave Lauck, an expert witness for SAC. (Mot. Strike, ECF No. 41). In addition to opposing both of AMBI's motions, SAC has cross-moved for summary judgment regarding AMBI's unjust enrichment claim (SAC Mot. Summ. J., ECF No. 49). No hearing is required. *See* Local Rule 105.6 (D. Md. 2018). For the reasons set forth below, AMBI's motion for summary judgment (ECF No. 43) will be granted, SAC's cross-motion for summary judgment (ECF No. 49) will be denied, and AMBI's motion to strike SAC's supplemental expert report (ECF No. 41) will be denied as moot. In addition, as set forth below, the parties are ordered to file additional briefing addressing the jurisdictional questions raised by the Court's disposition of the present cross-motions for summary judgment.

## I.    *Factual and Procedural Background*

In April 2018, SAC, a firearms manufacturer, sought to purchase a gas piston system for incorporation into its rifles. (Kalua Depo. at 46:9–48:17, SAC Mot. Summ. J. Ex. 2, ECF No. 49-4.) After investigating potential options, SAC ultimately connected with AMBI President Michael Brown, who SAC's then-CEO Jason Kalua knew through prior business dealings. (*Id.* at 48:13–50:10.) Brown was the owner of U.S. Patent 9,816,769 (the "Brown Patent") which "relates to a gas piston system that allows excess gas pressure to be vented in a forward direction." (Brown Patent at 9, AMBI Mot. Summ. J. Ex. 1, ECF No. 43-4.)    Brown, Kalua, and other SAC representatives had a meeting on April 23, 2018, where Brown demonstrated AMBI's gas piston system and indicated that he would provide product support if SAC were to purchase the Brown Patent. (Brown Depo. at 119:15–120:7, SAC Mot. Summ. J. Ex. 4, ECF No. 49-6.)  After further discussion, including a "Mil-Spec Test" of an AMBI rifle, SAC ultimately decided to move forward with the purchase of the Brown Patent. (*See id.* at 55:5–18, 68:10–11.)

On August 24, 2018, the parties entered into the Agreement, under which SAC would pay "the sum of Two and one half Million Dollars" in "monthly installments of $100,000.00 USD for 25 months," after which "[u]pon receipt of the above payment in full [AMBI would] execute and deliver the Patent Assignment document." (*See* Patent Purchase Agreement, AMBI Mot. Summ. J. Ex. 2, ECF No. 43-5.) Despite the terms of the Agreement, AMBI transferred the Brown Patent after receiving the first installment, executing a patent assignment in favor of SAC on September 17, 2018. (*See* Patent Assignment, AMBI Mot. Summ. J. Ex. 5, ECF No. 43-8.)

SAC then realized that—contrary to the expectations of its owner, Jose Shincariol—the Brown Patent could not be readily adapted for use on SAC's firearms. (Shincariol Depo. at 37:14–17, SAC Mot. Summ. J. Ex. 1, ECF No. 49-3.)  To resolve this issue, SAC reached back out to

2

Brown, who agreed to fly to SAC's factory in Arizona and help SAC integrate the gas piston system onto its firearms. (Kalua Depo. at 96:10–97:9.) After several weeks of working together, Brown and SAC were able to successfully fit the gas piston system onto an SAC rifle. (*Id.*) However, SAC was unable to integrate the system at scale and has yet to manufacture and sell rifles with the gas piston system described in the Brown Patent. (Shincariol Depo. at 129:9–21.)

Despite these setbacks, SAC continued to make monthly payments of $100,000 to AMBI, per the terms of the Agreement. However, due to cash flow issues, SAC ceased making payments to AMBI on August 15, 2019, leaving $1.4 million of the total purchase price unpaid. (*Id.* at 37:3–6.)

On August 23, 2019, AMBI filed this lawsuit in the Circuit Court for Baltimore County. (Compl., ECF No. 2.)   On February 27, 2020, SAC filed five counterclaims, including counterclaims alleging that the Brown Patent was invalid based on anticipation and obviousness. (*See* Counterclaims at ¶¶ 46–52, ECF No. 7.) Based on this patent invalidity counterclaim, AMBI removed the case to this Court pursuant to 28 U.S.C. § 1454(a). (Notice of Removal, ECF No. 1.)

On April 23, 2020, the Court entered a scheduling order that set the close of discovery for August 14, 2020. (ECF No. 20.) However, by this deadline, SAC's expert, Dave Lauck, had not been made available for a deposition, leading AMBI to file a Motion to Compel Discovery seeking to depose Lauck. (*See* ECF No. 27.) Finding that "Plaintiff is entitled to the opportunity to depose Defendant's expert before Plaintiff is required to make its motion for summary judgment," this Court extended the initial summary judgment deadlines and ordered SAC to make Lauck available for deposition on or before October 15, 2020. (*See* ECF No. 37 at 1.) However, the order noted that "[t]he discovery period is only extended as it relates to Mr. Lauck's deposition." (*Id.*) AMBI ultimately deposed Lauck on September 25, 2020. (*See* Mot. Strike at 2.)

On September 30, 2020, despite the limiting language in the Court's order, Lauck issued a two-page supplemental expert report, purporting to raise additional points "after [his] review of the piston system comparison video produced by AMBI and the deposition testimony of AMBI's expert, Christopher Bartocci, dated August 10, 2020." (Lauck Supplemental Expert Report at 1, Mot. Strike Ex. A, ECF No. 41-2.) On October 14, 2020, AMBI moved to strike this report as untimely. (*See* Mot. Strike at 9.) Subsequently, both parties submitted cross-motions for summary judgment. (See ECF Nos. 43, 49.)

## II.   *Summary Judgment Standard*

A party seeking summary judgment must show "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If a party carries this burden, then the court will award summary judgment unless the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ. P. 56(e). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented, and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. To carry these respective burdens, each party must support its assertions by citing specific evidence from the record. Fed. R. Civ. P. 56(c)(1)(A). The court will assess the merits of a summary judgment motion, and any responses, by viewing all facts and making reasonable inferences in the light most favorable to the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Iko v. Shreve*, 535

4

F.3d 225, 230 (4th Cir. 2008). When both parties file motions for summary judgment, the court evaluates "each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 729 (D. Md. 1996) (citations omitted).

### III. *Analysis*

The Court will grant AMBI's motion for summary judgment as to the breach of contract claim, as well as all of SAC's contractual counterclaims. In doing so, the Court will deny AMBI's motion to strike Lauck's supplemental expert report as moot, as SAC does not rely on that report in opposing summary judgment, and the Court's disposition of the patent claim renders Lauck's report immaterial to further proceedings. The Court will also deny SAC's motion for summary judgment with respect to the unjust enrichment claim.

#### A. *Breach of Contract*

"Under Maryland law, the elements of a breach of contract are (1) a contractual obligation and (2) a material breach of that obligation." *Chubb & Son v. C & C Complete Servs., LLC*, 919 F. Supp. 2d 666, 678 (D. Md. 2013). The crux of AMBI's breach of contract claim, as well as most of SAC's counterclaims, is a disagreement about the scope of AMBI's contractual obligation under the Agreement. AMBI argues that the "Patent Purchase Agreement" is neither more nor less than what its title implies—namely, an agreement between the parties to purchase the gas piston system patent for a sum of $2.5 million. (AMBI Reply at 9, ECF No. 53-2.) In contrast, SAC argues that "the purpose of the Agreement went well beyond what was explicitly stated in the Agreement" and that "SAC's successful ability to manufacture the gas piston system and incorporate it into their rifles was a necessary condition to payment." (SAC Mot. Summ. J. Mem. Supp. at 13, ECF No. 49-1.)

5

In determining the scope of contacts, this Court applies Maryland law's "principle of the objective interpretation of contracts."[1] *John L. Mattingly Constr. Co. v. Hartford Underwriters Ins. Co.*, 999 A.2d 1066, 1074 (Md. 2010). Under this principle, a court's analysis "is necessarily focused on the four corners of the agreement" and if "the clear language of [the] contract is unambiguous, the court will give effect to its plain, ordinary, and usual meaning." *Id.* (internal quotations omitted). A court is permitted to consider "extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract" only if the language of the contract is ambiguous. *Id.* Ambiguity permitting the consideration of such extrinsic evidence exists if, and only if, the contract "is subject to more than one interpretation when read by a reasonably prudent person." *Id.* Whether a contract is ambiguous is a question of law. *Calomiris v. Woods*, 727 A.2d 358, 362 (Md. 1999).

As AMBI points out, SAC identifies no language within the four corners of the Agreement that is ambiguous, much less sufficiently ambiguous to permit the interpretation of the Agreement that SAC puts forward. (*See* AMBI Reply at 10, ECF No. 53.) Instead, SAC relies solely on extrinsic evidence related to the parties' discussions and expectations to show that the parties intended to enter into a far more complex contract than was ultimately memorialized. (*See* SAC Mot. Summ. J. Mem. Supp. at 13 (arguing that "[t]he pre-assignment actions and words of the parties . . . are indicative of a different interpretation").) However, absent ambiguity in the contract itself, the "language of an agreement will not give away [sic] to what the parties thought that the agreement meant or intended it to mean." *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 653 (Md. 2001).[2]

---

[1] Paragraph 5 of the Agreement states that the Agreement "shall be construed in accordance with and governed by the laws of the State of Maryland applicable to contracts." (*See* Agreement at ¶ 5.)

[2] SAC points out that the Agreement "does not include a standard integration clause." (SAC Mot. Summ. J. Mem. Supp. at 7.) This does not alter the Court's analysis because, "although an integration clause is indicative of the

6

The cases, including cases not applying Maryland law, cited by SAC are not to the contrary. For example, SAC cites *In re World Trade Center Disaster Site Litigation*, 754 F.3d 114 (2d Cir. 2014), for the proposition that "courts have held that an omission of a material issue or issues can create an ambiguity." (SAC Mot. Summ. J. Mem. Supp. at 13.) However, when read in full, that case states that "an omission as to a material issue can create an ambiguity . . . where the context *within the document's four corners* suggests that the parties intended a result not expressly stated." *Id.* at 122 (emphasis added) (internal quotation marks and citation omitted).[3]

Given the absence of a textual ambiguity in the Agreement, SAC's extrinsic evidence is irrelevant, and this Court must enforce the Agreement according to its plain terms. Those terms require, in relevant part, that (1) "[i]n consideration of the assignment of the Patent, [SAC] shall pay [AMBI] the sum of Two and one half Million Dollars ($2,500,000.00);" and (2) AMBI "will execute and deliver the Patent Assignment document attached hereto as Exhibit A to irrevocably sell, assign, transfer, convey and deliver to [SAC] all of [AMBI's] right, title and interest in, to and under The Patent." (Patent Purchase Agreement at 2.) SAC does not dispute that AMBI has assigned the Brown Patent to it, as required by the Agreement, nor that SAC has failed to pay the full amount required by the Agreement. Therefore, AMBI has made a *prima facie* showing that SAC has breached the Agreement for failing to pay the remaining balance owed under its plain terms. *See Taylor*, 776 A.2d at 651 ("To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant

intention of the parties to finalize their complete understanding in a written contract, the existence of such a clause in a contract is not a prerequisite to application of the parol evidence rule." *Huggins v. Prince George's Cnty., Md.*, 683 F.3d 525, 534 (4th Cir. 2012).

[3] In its brief, SAC stylizes this quote as "an omission as to a material issue can create an ambiguity . . . where the context . . . suggests that the parties intended a result not expressly stated" (SAC Mot. Summ. J. Mem. Supp. at 13.) By omitting the text italicized above, SAC alters the quote in a way that may mislead a reader into believing that New York law permits a finding of ambiguity without reference to the contractual language. Counsel is advised to ensure their use of ellipsis does not risk altering the meaning of a quoted passage.

breached that obligation."). Because AMBI has established both elements of a breach of contract claim under Maryland law, the Court will grant AMBI summary judgment on Count I of its Complaint, unless SAC's counterclaims justify rescission of the Agreement.

### B. *Contractual Counterclaims*

In addition to—and partly contingent upon—its argument contesting the scope of the Agreement, SAC raises five contractual counterclaims, seeking rescission of the Agreement and return of the $1.1 million paid by SAC under the Agreement. (*See* Counterclaims at 8.) After analyzing each of SAC's counterclaims in turn, the Court concludes that SAC has failed to show a genuine dispute of material fact on any of these counterclaims.

#### i. *Mutual Mistake*

To show mutual mistake, a party must establish "clearly and beyond doubt that there has been a mistake, [and] he must also be able to show with equal clearness and certainty the *exact* and *precise* form and import that the instrument ought to be made to assume, in order that it may express and effectuate what was really intended by the parties." *Higgins v. Barnes*, 530 A.2d 724, 727 (Md. 1987) (emphasis in original) (internal quotation marks and citations omitted). While SAC marshals evidence purportedly supporting a differing interpretation of the Agreement, it fails to point to any evidence as to what *mistake* occurred that prevented this interpretation from being reduced to writing. *See Flester v. Ohio Cas. Ins. Co.*, 307 A.2d 663, 670 (Md. 1973) ("[I]t must be conclusively established that both parties understood the contract as it is alleged it ought to have been expressed . . . but for the mistake alleged in reducing it to writing."). In fact, the evidence that exists with respect to the drafting of the Agreement illustrates that SAC's executives believed that the writing accurately reflected the intentions of the parties and did not omit any terms. (*See* Kalua Depo. at 88:11–89:1.) Given the lack of factual support regarding a mistake in the drafting

8

of the Agreement, and the Court's conclusion that the Agreement is unambiguous, the Court will grant summary judgment on SAC's mutual mistake counterclaim. *See Hearn v. Hearn*, 936 A.2d 400, 409 (Md. Ct. Spec. App. 2007) ("The burden of persuasion upon a party seeking reformation of an instrument [based on fraud, duress or mutual mistake] is significantly higher than the preponderance standard used to determine the existence of an ambiguity.").

### ii. Unilateral Mistake

SAC next contends that "SAC entered into the Agreement under a fundamental unilateral mistake." (SAC Mot. Summ. J. Mem. Supp. at 21.) As the Maryland Court of Appeals explained in *Creamer v. Helferstay*, "the law in [Maryland] is clear that, absent intentional culpable conduct, such as fraud, duress, or undue influence[,] a unilateral mistake is ordinarily not ground for relief from a contract." 448 A.2d 332, 339 (Md. 1982). SAC does not argue that any such culpable conduct induced SAC to sign the Agreement, but rather attempts to limit this rule by citing Judge Chuang's cogent canvassing of Maryland law in *Saul Holdings Limited Partnership v. SeraCare Life Sciences, Inc.*, Civ. No. TDC-14-1444, 2015 WL 772564 (D. Md. Feb. 23, 2015).

While *Saul Holdings* identifies two exceptions to the rule laid down in *Creamer*, this case does not fit into either. First, *Saul Holdings* explains that "*Creamer* addressed whether a unilateral mistake could justify a specific remedy: *rescission* of the contract," and identifies cases where courts in Maryland have granted forms of equitable relief that are less drastic than rescission based on a unilateral mistake—even in the absence of culpable conduct. *Id.* at *1–*2; *see also, e.g., Beckenheimer's, Inc. v. Alameda Assocs. Ltd. P'ships*, 611 A.2d 105 (Md. 1992) (excusing failure to comply with requirements related to the exercise of a contract option based on a unilateral mistake as to terms). Even if the rule in *Creamer* does apply only to rescission, that is exactly the

9

remedy that SAC seeks here, so SAC must show that culpable conduct induced SAC to rely on its unilateral mistake.[4]

The second exception to the rule laid down in *Creamer* is also unavailing, as it permits "rescission . . . based on a clerical error, such as when a bid was submitted with an incorrect figure and the party not in error should have suspected the existence of a mistake." *Saul Holdings*, 2015 WL 772564, at *2; *see also Balt. v. DeLuca-Davis Constr. Co.*, 124 A.2d 557, 562–66 (Md. 1956). As discussed above, SAC has pointed to no mistake in reducing the parties' agreement to writing, and therefore this "clerical error" exception is inapplicable.

In sum, because no exception to the *Creamer* rule applies to this case, and SAC has not shown any "intentional culpable conduct" on AMBI's part, the Court will grant summary judgment with respect to this counterclaim.

### iii. *Frustration of Purpose*

SAC next argues that, even if there was no mistake as to the Agreement, the Agreement's purpose was frustrated "as both AMBI and SAC unsuccessfully undertook to engineer the piston system for manufacture and incorporation on to SAC's rifles." (SAC Mot. Summ. J. Mem. Supp. at 19.)

This argument is based on the false premise that the scope of the Agreement "encompass[ed] the manufacture and incorporation of the gas piston system claimed by the Patent onto SAC's rifles." (*Id.* at 18.) As discussed above, the Agreement's plain text reflects a narrower

---

[4] Here again, SAC stylizes the quote from *Saul Holdings* as "the court in *Creamer* addressed whether a unilateral mistake could justify a specific remedy . . . ." (SAC Mot. Summ. J. Mem. Supp. at 21.) The omission of what specific remedy was considered in *Creamer* could mislead one into assuming that the remedy sought in *Creamer* was irrelevant, rather than squarely on point, to this case. Counsel is again reminded to ensure their use of ellipsis does not risk creating a misleading impression of quoted passages.

scope: the purpose of the Agreement was the transfer of the Brown Patent, an event that has already occurred, and was not frustrated.

Moreover, even if SAC was correct as to the purpose of the Agreement, it would still not have established that the Agreement's purpose was frustrated, as the doctrine of frustration is based on "the purpose of a contract [being] rendered impossible of performance by a *supervening event or circumstance*." *Harford Cnty. v. Town of Bel Air*, 704 A.2d 421, 431 (Md. 1998) (emphasis added) (quoting *Montauk Corp. v. Seeds*, 138 A.2d 907, 911 (1958). The frustrating event identified by SAC is SAC's inability to adapt the gas piston system to its rifles. However, SAC could have discovered the incompatibility between the Brown Patent and SAC's rifles at the time SAC contracted to purchase the patent. Although SAC's incomplete due diligence resulted in SAC not realizing this incompatibility until after the contract was signed, that does not render the event *supervening* as a matter of logic or of law. *See* Supervene, MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/supervene (last accessed Mar. 10, 2021 ("to follow or result as an additional, adventitious, or unforeseen development"); *see also Montauk*, 138 A.2d at 911 ("The majority of the courts stress this principle in deciding cases on frustration, and hold that if the parties could have reasonably anticipated the event, they are obliged to make provisions in their contract protecting themselves against it.")

Thus, the Court finds that the Agreement's purpose was not frustrated, and AMBI is entitled to summary judgment with respect to SAC's third counterclaim.

### *iv. Implied Warranty of Fitness for a Particular Purpose*

As its fourth counterclaim, SAC argues that Maryland law imposes an implied warranty of fitness for a particular purpose on the sale of goods, and that AMBI implicitly warranted that "the gas piston system claimed in the Patent could be adapted for use on SAC's rifles for manufacture

11

and sale." (Counterclaims at ¶ 42.) Such warranties are imposed by Maryland law where "the seller at the time of the contracting has reason to know a particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 358 (D. Md. 2011) (quoting Md. Code Ann., Com. Law § 2–315). However, this warranty is imposed only on "transactions in goods," with "goods" being defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid." Md. Code Ann., Com. Law § 2–105. AMBI argues that this limitation renders the warranty statute inapposite to the Agreement, as the Brown Patent is not a good that is "movable at the time of identification to the contract for sale." *Id.* This Court agrees.

In interpreting a statute, there is a general "presumption of consistent usage," such that "identical words used in different parts of the same act are intended to have the same meaning." *Healthkeepers, Inc. v. Richmond Ambulance Auth.*, 642 F.3d 466, 472 (4th Cir. 2011). Notably, other provisions in the Commercial Law section of the Maryland Code establish that a patent does not fall within the definition of "goods." For instance, the Commercial Law provision regarding secured transactions defines the term "goods" as "all things that are movable when a security interest attaches." *See* Md. Code Ann., Com. Law § 9–102(44). The definition of "goods" can be contrasted with that of "general intangibles," which are "any personal property, including things in action, other than . . . goods." *Id.* § 9–102(42). This delineation is key because the Editors' Notes confirm that, "[a]s used in the definition of 'general intangibles,' 'things in action' includes rights that arise under a license of intellectual property including the right to exploit the intellectual property without liability for infringement." Editors' Notes 5d, Md. Code. Ann., Com. Law § 9–

12

102. Absent evidence that rebuts the presumption that the term "goods" is used consistently across the Commercial Law section of the Maryland Code, this distinction will be imputed into § 2–105, thereby excluding a patent license from the definition of "goods" in that section as well. SAC offers no reason why these equivalent terms should not be read harmoniously.

Moreover, other courts considering similar language to that in the Maryland Code have also found that patents are not "goods." *See, e.g., Hilsen v. Am. Sleep All., LLC*, Civ. No. DBP-15-0714, 2016 WL 3948065, at *3 (D. Utah July 19, 2016) ("Several federal courts interpreting the Uniform Commercial Code ('UCC') have found that a patent is not a good under Article 2 of the UCC."); *see also* U.C.C. § 2-105 (AM. L. INST. & UNIF. L. COMM'N 1997) (defining "goods" in the same manner as § 2–105 of the Maryland Code). Further, courts have also raised concerns that "[t]o construe the term 'goods' to encompass 'patents' would distort the term 'goods' beyond all recognition and take that term out of the commercial context in which it is being used." *U.S. Test, Inc. v. NDE Env't Corp.*, 196 F.3d 1376, 1382 (Fed. Cir. 1999). The Maryland Code provides no reason to impose such a distortion here.

Rather than provide such a reason, SAC instead reframes the Agreement as one that "contemplated more than just a mere patent assignment, including the transfer of [the] gas piston system itself." (SAC Mot. Summ. J. Mem. Supp. at 18.) While SAC is correct in noting that "[t]he gas piston system is unquestionably a good" (*id.*), this argument is merely a variation on SAC's other arguments that are premised on a broad, atextual interpretation of the Agreement. As this Court has already rejected the viability of this alternative interpretation, SAC's argument fails.

13

Thus, the Court will grant summary judgment to AMBI with respect to SAC's counterclaim of implied warranty of fitness for a particular purpose.

### v. Failure of Consideration

SAC's last counterclaim contends that the Brown Patent is invalid and that, therefore, "AMBI utterly failed to provide SAC with the requisite consideration for SAC's $2.5 million." (SAC Mot. Summ. J. Mem. Supp. at 13.) While SAC initially alleged that the patent was invalid under both 35 U.S.C. § 102 and 35 U.S.C. § 103 (*see* Counterclaims at ¶¶ 47–48), in support of its motion for summary judgment, SAC continues to assert invalidity only with respect to 35 U.S.C. § 103. (SAC Mot. Summ. J. Mem. Supp. at 15 n.17.) To resolve this counterclaim, the Court will first address two evidentiary issues raised by AMBI with respect to reports submitted by SAC's expert. The Court will then turn to the merits of SAC's obviousness counterclaim.

### 1. Motion to Strike

Approximately one week before submitting its motion for summary judgment, AMBI moved to strike as untimely a two-page supplemental report produced by Lauck on September 30, 2020. (Mot. Strike at 9.) SAC opposes the motion to strike, but does not rely on the supplemental report in its own summary judgment briefing. (*See* App'x of Exs. to SAC Mot. Summ. J., ECF No. 49-2.) Based on this, as well as on the Court's disposition of the cross-motions for summary judgment, AMBI's motion to strike is denied as moot. *See Glass v. Anne Arundel Cnty.*, 38 F. Supp. 3d 705, 712–13 (D. Md. 2014) (denying motion to strike affidavit as moot "[b]ecause the Court does not rely on the affidavit in resolving [the moving party's] summary judgment motion").

### 2. Unsigned Expert Report

More problematic for SAC is the fact that Lauck's primary expert report (ECF No. 49-6) is unsigned, and "it is well established that unsworn, unauthenticated documents cannot be

14

considered on a motion for summary judgment." *Solis v. Prince George's Cnty.*, 153 F. Supp. 2d 793, 798 (D. Md. 2001) (quoting *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir.1993)). While SAC brushes this issue off as "a mere oversight" (SAC Reply at 3 n.5, ECF No. 54), "it is well-established at both the circuit level and in this District that unsworn expert reports are inadmissible on summary judgment." *Doe v. Bd. of Educ. of Prince George's Cnty.*, 982 F. Supp. 2d 641, 660 n.5 (D. Md. 2013) (collecting cases refusing to consider such reports).

An exception to this rule exists when "the party submitting the evidence show[s] that it will be possible to put the information . . . into an admissible form." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015 (internal quotation marks and citation omitted)). A party can cure the evidentiary issues posed by an unsworn report through "subsequent verification or reaffirmation of an unsworn expert's report, either by affidavit or deposition." *Id.* at 539. Here, however, SAC has not submitted an affidavit by Lauck, and has instead provided excerpts from Lauck's deposition to support the consideration of his unsworn primary expert report. *Id.* However, none of these excerpts reaffirms or even speaks to the points in Lauck's primary expert report that SAC relies on in its motion for summary judgment. Thus, the Court has no way to assure itself that it "will be possible to put [Lauck's report] into an admissible form," and thereby cannot consider his primary expert report for the purpose of deciding these cross-motions for summary judgment. *Humphreys*, 790 F.3d at 538.

The Court acknowledges that, as SAC points out, courts have considered unsigned expert reports in deciding motions for summary judgment—even without explicitly finding that equivalent evidence would be admissible at trial. *See Norvell v. Metro. Life Ins. Co.*, Civ. No. RDB-14- 3662, 2015 WL 6549274, at *3 n.5 (D. Md. Oct. 28, 2015). However, as discussed above, the predominant practice in the Fourth Circuit is not to consider unsworn reports absent an

alternative means of affirming their ultimate admissibility at trial. The Court finds no reason to depart from this general rule.

SAC's opposition to AMBI's summary judgment motion on the lack of consideration counterclaim is entirely based on Lauck's primary expert report. (SAC Mot. Summ. J. Mem. Supp. at 15 ("In support of this position, SAC offered the report and testimony of Mr. Lauck.").)[5] As SAC has not established that the relevant portions of Lauck's report would be admissible at trial, they cannot be considered here, and the Court will grant AMBI summary judgment on SAC's lack of consideration counterclaim. Further, even if the Court were to consider Lauck's primary expert report in these circumstances, it would still grant AMBI summary judgment on the substantive question of patent obviousness.

### 3. *Obviousness of the Brown Patent*

Setting aside its evidentiary defects, the thrust of Lauck's primary expert report, and of SAC's counterclaim, is that the Brown Patent underlying the Agreement is obvious, and therefore invalid under 35 U.S.C. § 103. "A party seeking to invalidate a patent on obviousness grounds must demonstrate by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *Ivera Med. Corp. v. Hospira, Inc.*, 801 F.3d 1336, 1344 (Fed. Cir. 2015) (quoting *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1347 (Fed.Cir.2014)).   Whether a patent is obvious is primarily driven by a synthesis of four inquiries: "(1) the scope and content of the prior art;[6] (2)

---

[5] Despite the phrasing of its argument, SAC does not offer any testimony from Lauck's deposition as substantive evidence in opposing summary judgment and does not include Lauck's deposition transcript as an exhibit to its initial motion for summary judgment. (ECF No. 49-2.)

[6] As used here and throughout this memorandum, "prior art" refers to existing inventions that the parties contend bear on the obviousness of the Brown Patent, namely U.S. Patent Nos. 7,469,624 (the "Adams Patent"), 7,461,581 (the "Wise Patent"), 7,856,917 (the "Noveske Patent"), 4,244,273 (the "Langendorfer Patent"), U.S. Patent Application

the level of ordinary skill in the pertinent art; (3) the differences between the claimed invention

and the prior art; and (4) the evidence of secondary factors [of non-obviousness], such as

commercial success, long-felt need, and the failure of others." *Cheese Sys., Inc. v. Tetra Pak

Cheese and Power Sys., Inc.*, 725 F.3d 1341, 1347–48 (Fed Cir. 2013).  While these inquiries are

questions of fact, "the ultimate determination of obviousness is a legal conclusion." *Id.* at 1348.

In opposing summary judgment, SAC fails to appreciate the hybrid legal-and-factual nature

of a determination of obviousness.  SAC argues, largely in a conclusory fashion, that "whether the

invention in the Patent would have been obvious to a person of ordinary skill in the art . . . is a

clear 'battle of the experts.'"  (SAC Mot. Summ. J. Mem. Supp. at 16.)  As explained above,

however, although a determination of obviousness is derived from factual predicates, it is one of

*law*.  In eliding this distinction, SAC fails to explain (1) which material facts relevant to the

obviousness inquiry are disputed by its expert; and (2) how resolution of those disputes by a

factfinder, combined with any facts not in dispute, would permit SAC to show that the patent was

obvious by clear and convincing evidence.  *See Zoltek Corp. v. United States*, 95 Fed. Cl. 681, 693

(2010) (emphasis added) ("Where experts present conflicting opinions on a *factual matter

pertinent to a determination of obviousness*, summary judgment is often inappropriate.");  *see also*

Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must

support the assertion by . . . citing to particular parts of materials in the record.").

Moreover, a review of the expert reports in this case makes clear that Lauck's report does

not create a material factual dispute on the issue of obviousness.  The gravamen of Lauck's report

is that "[t]here are really no functional differences between the sum total of the 'prior art' . . . and

the Brown [Patent] claims, except that no piece of information I reviewed shows the entirety of

---

Publication No. 2013/20269510 (the "Sullivan Application"), the Adams Arms Piston Systems, the Bushmaster Gas
Piston Rifle, and the D&L Carbine.  (*See* AMBI Mot. Summ. J. Mem. Sup. at 27, ECF No. 43-2.)

what the Brown [Patent] claims." (Lauck Report at 22, SAC Mot. Summ. J. Ex. 5, ECF No. 49-8.) Although AMBI's expert disputes this view (*see* Bartocci Report at 18–21, AMBI Mot. Summ. J. Ex. 19, ECF No. 43-22), this dispute is not material, as even if "[t]he evidence of the nonmoving party is to be believed, and all reasonable factual inferences are [ ] drawn in its favor," SAC would still not have established obviousness by clear and convincing evidence. *See C. Sanchez and Son, Inc. v. United States*, 6 F.3d 1539, 1541 (Fed. Cir. 1993).

This is because Lauck's report provides no reason why, even if he or she had all the building blocks for the Brown Patent, "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention." *Ivera*, 801 F.3d at 1344. It is "important to identify a *reason* that would have prompted a person of ordinary skill in the relevant field to combine the elements *in the way* the claimed new invention does." *Purdue Pharma L.P. v. Depomed, Inc.*, 643 F. App'x 960, 965 (Fed. Cir. 2016) (emphasis in original) (citation omitted). Thus, although Lauck's report may raise a dispute as to the scope of the prior art and whether it could be readily combined to create the Brown Patent, his report does not present any facts showing why a person of ordinary skill would have done so. *See Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1359 (Fed. Cir. 2017) (internal quotation marks and citations omitted) ("The court should consider a range of real-world facts to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.").

The lack of such a rationale for combining the prior art is underscored by a consideration of the technological context described in the Brown Patent. The patent explains that "gas-operated auto-loading firearms use a portion of the projectile propellant gases to cycle the firearm action." (Brown Patent at 9.) Relevant here, this cycling can be achieved through two systems, a "direct

18

impingement system" and a "gas piston system," which differ in the mechanism through which the projectile propellant is leveraged by the firearm. (*Id.*) As described in Lauck's report and the prior art, gas piston systems are commonly used in a variety of firearms, and have been for several decades. (*See* Lauck Report at 12–13.)

A key feature of some gas piston systems is that a portion of the propellant is vented out of the rifle, through a variety of mechanisms. (*See* Bartocci Report at 9-11 (describing various features of other patented gas piston systems); *see also* Brown Patent at 9.)   According to the Brown Patent, this venting posed one of two problems at the time that the Brown Patent was submitted. Some systems "vent[] through an exhaust port in the cylinder wall," which can cause problems because "this results in venting of hot propulsion gases inside a forearm of hand guard, causing a significant heat transfer to an area where the user commonly places a hand." (Brown Patent at 9.) To solve these problems, other systems provide for "a forwardly directed gas exhaust vent," though this improvement comes at the cost of "requir[ing] complex machining to manufacture parts" that have been "difficult or cumbersome to disassemble, and/or have been difficult to thoroughly clean." (*Id.*)

The core innovation alleged in the Brown Patent is that it provided a gas piston system with a forwardly-directed gas exhaust vent, while mitigating the manufacturing and maintenance complexity that was present in existing systems that functioned similarly. To the extent Lauck's report addresses these purported innovations, it does so in an indirect and conclusory fashion, merely stating, without support, that "[p]iston drive operation, with forward (and adjustable) gas exhaust, with simple disassembly and cleaning has been in use years prior to 2016." (Lauck Report at 19.) Such a "conclusory affidavit addressing the question of obviousness . . . is not sufficient to exclude the possibility of summary judgment." *Zoltek Corp.*, 95 Fed Cl. at 683.  In sum, Lauck's

report is devoid of non-conclusory allegations as to why someone would be motivated to combine the prior art in the manner described in the Brown Patent, in order to achieve the goals articulated in that patent. *See Purdue Pharma*, 643 F. App'x at 965 (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 401 (2007)) ("A patent . . . is not proved obvious merely by demonstrating that each element was, independently, known in the prior art."). This failure dooms SAC's obviousness argument, as "[a] nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law." *Dairyland Power Co-op v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994).

Having determined that AMBI established the elements of breach of contract, and SAC's contractual counterclaims are not valid, the Court will grant AMBI summary judgment with respect to Count I.

### C. Unjust Enrichment

In addition to its claim for breach of contract, AMBI also seeks equitable relief for unjust enrichment for the ancillary work performed by Brown in attempting to make the gas piston system work with SAC's firearms. Under Maryland law, a party seeking to recover in unjust enrichment must show three things: "(1) [a] benefit conferred upon the defendant by the plaintiff; (2) [a]n appreciation or knowledge by the defendant of the benefit; and (3) [t]he acceptance or retention by the defendant under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 351 (Md. 2007). The parties dispute only the third factor, which "serves to deprive the defendant

of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits quite honestly in the first instance." *Id.* at 352.[7]

The essence of the parties' dispute on this point is whether Brown provided the services as a "volunteer (also sometimes called an officious intermeddler)." *Hobbs v. St. Martin*, 320 F. Supp. 3d 748, 753 (D. Md. 2018) (applying Maryland law). A person is not entitled to unjust enrichment as a volunteer if he or she "without mistake, coercion or request has unconditionally conferred a benefit upon another." *Id.* (emphasis omitted). In support of its argument that Brown's work was voluntary, SAC points to pre-contractual evidence, including an email where Brown included "[m]anufacturing engineering support" in the list of things he would provide to SAC if it purchased the Brown Patent. (*See* SAC Reply Ex. 3, ECF No. 54-3.) AMBI points out, however, that the email predicated this offer on a different payment structure than was ultimately agreed on by the parties, so Brown's willingness to provide these services was implicitly premised on a different contractual relationship. (*Id.*)

If Brown did not, in fact, offer these services prior to entering into the Agreement with SAC, then he is not a "volunteer," as the genesis for the provision of the services was SAC's *request* that Brown provide the additional engineering services to attempt to make the patent functional. (*See* SAC Mot. Summ. J. Mem. Supp. at 8 ("SAC sought additional engineering and consulting services from Mr. Brown.").) Thus, a dispute of material fact exists as to whether Brown intended to provide the engineering services in an affirmatively voluntary fashion, or

---

[7] SAC also raises an argument that Plaintiff may not recover under a quasi-contractual remedy because the services provided were covered by the Agreement. *See Kantsevoy v. LumenR LLC*, 301 F. Supp. 3d 577, 599 (D. Md. 2018). This argument fails for the same reason as SAC's other arguments regarding the appropriate interpretation of the contract. *See supra* Part III.A.

21

instead provided services at the request of SAC. Accordingly, summary judgment on Count II is inappropriate.

### D. Subject Matter Jurisdiction

Although AMBI's claim for unjust enrichment remains viable, the disposition of the remaining claims and counterclaims raises serious concerns about the Court's subject matter jurisdiction. *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."). This case was originally removed from state court on the basis of SAC's counterclaim that the Brown Patent is invalid (*see supra*, Part III.B.v.), which has now been dismissed from the case. (*See* Notice of Removal at ¶ 7.)

Further, it is not clear that the only remaining claim in this case meets the amount-in-controversy requirement, such that the Court may continue to exercise original jurisdiction on the basis of diversity of citizenship. *See* 28 U.S.C. § 1332(a). This is because, although AMBI seeks approximately $220,000 for the services provided to SAC, that amount is based on "Plaintiff expend[ing] a significant amount of time and resources in connection with the Additional Services." (AMBI Mot. Summ. J. Mem. Supp. at 5, ECF No. 43-2.) However, "[u]nlike a statutory cause of action that provides a damages remedy based on a plaintiff's loss, the touchstone of unjust enrichment is a defendant's gain." *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 257 (4th Cir. 2020). While the scope of the Agreement meant the challenges in commercializing the Brown Patent were not salient to the substantive breach of contract claim and counterclaims, the commercial failure of the Brown Patent may be relevant here, as it raises serious doubts that the benefit conferred by Brown's work exceeds $75,000. *See Edoff v. T-Mobile Ne. LLC*, Civ. No. ELH-18-3777, 2019 WL 1459046, at *2 (D. Md. Apr. 2, 2019) (quoting *Dart Cherokee Basin*

*Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014)) ("Evidence establishing the amount [in controversy] is required by § 1446(c)(2)(B) only when the plaintiff contests, or the court questions, the [removing parties'] allegation."). Plaintiff's reliance on the time expended by Brown as the basis for its amount in controversy means that there is little in the record to dispel those doubts.

Due to this, the Court wishes to ensure that it may rightly continue exercising jurisdiction over the remaining claim. Therefore, the parties are directed to submit briefing identifying evidence that AMBI's unjust enrichment claim satisfies the amount-in-controversy requirement. They may also address the question of whether and why—if the Court finds it lacks diversity jurisdiction—the Court should nonetheless continue to exercise supplemental jurisdiction over this claim. *See* 28 U.S.C. § 1367(c)(3) ("The district court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction); *see also Miller v. Terramite Corp.*, 114 F. App'x 536, 541 (4th Cir. 2004) ("Among the factors that inform this discretionary determination are convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy.").

## IV.    *Conclusion*

For the foregoing reasons, an order shall enter (1) granting AMBI's Motion for Summary Judgment (ECF No. 43); (2) denying SAC's Cross-Motion for Summary Judgment (ECF No. 49); (3) denying AMBI's Motion to Strike Lauck's supplemental expert report (ECF No. 41); and (4) requiring the parties to provide additional briefing with respect to the potential jurisdictional issues raised by the Court.

DATED this _//_ day of March, 2021.

BY THE COURT:

James K. Bredar
Chief Judge