**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | |
|---|---|
| AMBIMJB, LLC, | * |
| | * |
| *Plaintiff/Counter-Defendant* | * |
| | * Civil Case Number: 1:20-cv-00807-JKB |
| v. | * |
| | * |
| STRATEGIC ARMORY CORPS, LLC, | * |
| | * |
| *Defendant/Counter-Plaintiff* | * |

**PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF THIS COURT'S CONTINUED SUBJECT MATTER JURISDICTION OVER PLAINTIFF'S CLAIM FOR UNJUST ENRICHMENT**

Plaintiff AMBIMJB, LLC ("Plaintiff" or "AMBI"), by and through undersigned counsel, respectfully submits this supplemental memorandum in support of this Court's continued subject matter jurisdiction over Plaintiff's claim for unjust enrichment.

**INTRODUCTION**

On March 11, 2021, this Court passed an Order (the "Summary Judgment Order") (ECF No. 56) granting Plaintiff's Motion for Summary Judgment (ECF No. 43) as to Count I (Breach of Contract) of Plaintiff's Second Amended Complaint (ECF No. 42 ¶¶ 20-26) and denying Defendant Strategic Armory Corporation's Cross-Motion for Summary Judgment (ECF No. 49) as to Count II (Unjust Enrichment) of Plaintiff's Second Amended Complaint (ECF No. 42 ¶¶ 27-32). As a result of the Summary Judgment Order, Plaintiff's claim for unjust enrichment remains to be adjudicated.

The Summary Judgment Order directs Plaintiff to submit briefing regarding the Court's subject matter jurisdiction over Plaintiff's claim for unjust enrichment that presents evidence

1

showing that the amount in controversy for the unjust enrichment claim satisfies the amount-in-controversy requirement of 28 U.S.C. § 1446(c)(2)(B), as well as identifies any additional reasons why the Court must, should, or should not retain jurisdiction over Plaintiff's unjust enrichment claim. (ECF No. 56.)  Plaintiff submits this brief in response to the Court's request.

As explained more fully below, Plaintiff's claim for unjust enrichment satisfies the amount-in-controversy requirement of 28 U.S.C. § 1446(c)(2)(B), and considerations of judicial economy compel this Court to retain supplemental jurisdiction over Plaintiff's unjust enrichment claim.

## ARGUMENT

### I. Plaintiff's Claim for Unjust Enrichment Satisfies the Amount-in-Controversy Requirement of 28 U.S.C. § 1446(c)(2)(B) as the Benefits Plaintiff Conferred Upon Defendant Exceed $75,000 in Value.

It is well established that the "classic measurement of unjust enrichment damages is the gain to the defendant, not the loss by the plaintiff." *Magavero v. Silverstein*, 142 Md.App. 259, 276 (2002); *Mass Transit Admin. v. Granite Const. Co.*, 57 Md.App. 766, 775 (1984) ("The restitution claim is not aimed at compensating the plaintiff, but at forcing the defendant to disgorge benefits that it would be unjust for him to keep."). A successful unjust enrichment claim serves to "deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits quite honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses." *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295-296 (2007).

In this case, Plaintiff alleges it:

> [C]onferred a benefit upon Defendant by sharing its ideas and intellectual property and providing its time and experience in connection with the Defendant's use and integration of the [Brown] Patent, and derivatives therefrom, together with the work product and deliverables resulting from Plaintiff's engineering and consulting services, into its business and product offerings.

(Second Amended Complaint ¶ 29, ECF No. 42.) The evidence adduced through discovery confirms the benefits Plaintiff conferred upon Defendant include (i) detailed engineering drawings (prints) and related 3-D computer aided design ("CAD") models, (ii) detailed, step-by-step manufacturing process instructions for producing the AR-15 and AR-10 upper receivers, AR-15 scaled-down piston system (including two-piece bolt carriers), and piston assembly components; (iii) formulation of cutting tool lists; (iv) design and engineering of tombstones, sub plates, fixtures, hardware, and coding for Computer Numerical Control ("CNC") horizontal milling machines; (v) test methodologies for testing of products, performance of testing, and review of test results; (vi) updated engineering drawings (prints) and CAD models with adjustments for full adaption onto Defendant's firearms; and (vii) other related trade secrets and know how – all of which allow Defendant to manufacture and produce firearms adapted with the patented gas piston system described more fully in U.S. Patent 9,816,769 (the "Brown Patent"). (*See* Exhibit 1, Excerpts from Plaintiff's Answers to Interrogatories, pp. 4-8.) It is inequitable for Defendant to retain the benefits Plaintiff conferred without the payment of their value. *Hill supra* at 295.

      **a. The Benefits Plaintiff Conferred Upon Defendant Allow Defendant to Manufacture and Produce Firearms Adapted with the Patented Gas Piston System.**

Here, when asked by interrogatory to "[d]escribe in complete detail all monetary and non-monetary benefits which [Defendant] received, including, but not limited to, revenues generated from the processes, fixtures and tooling designs which Plaintiff performed work in connection with," Defendant responded:

> SAC has not benefited in any way from any processes, fixtures, or tooling designs performed by Plaintiff. *Neither Plaintiff, nor SAC, was able to design a gas piston system falling within the scope of the '769 patent that could be incorporated into SAC's rifles.* Accordingly, SAC was never able to manufacture, sell, or offer for sale any product incorporating a gas piston system falling within the scope of the '769 patent.

(Exhibit 2, Excerpts from Defendant's Answers to Interrogatories, p. 3.) (emphasis added). This unfounded theme continues throughout the deposition of Jose Schincariol, owner of Defendant. (Exhibit 3, Schincariol Dep. 107:16-108:9 ("The answer I received from my technical team was that the system didn't work in our rifles, was not working in our rifles."); *id.* at 111:14-112:8 ("Because I bought a piston system that was not working."); *id.* at 115:17-116:5 ("It was the answer that I received that you saw in the last email saying that was not even close to work."); *id.* at 129:9-21 ("Because it didn't work, the system I was buying didn't work.")). Based on the foregoing and review of the record, it is reasonable to infer that an undeniable benefit Defendant hoped to obtain from the additional engineering and consulting services it requested from Plaintiff was the successful adaptation of the patented gas piston system onto firearms Defendant manufactures.

Jason Kalua, a former Chief Executive Officer of Defendant, testified that once Defendant encountered difficulty in adapting the gas piston system to its rifles, Defendant contacted Plaintiff's President, Michael Brown, for assistance; Mr. Brown, in turn, traveled to Defendant's offices in Arizona and successfully assisted Defendant with adapting the gas piston system to its rifles. (Exhibit 4, Kalua Dep. 95:12 – 97:9.) When asked whether Mr. Kalua received reports back as to whether Mr. Brown as able to assist Defendant in adapting the piston system onto Defendant's rifles, Mr. Kalua confirmed: "[] we had it fit." (*Id.* at 97:3-9.)

By email dated October 12, 2018, from Mr. Brown to Mr. Kalua, Mr. Brown confirms "[t]he sample scale down piston assemblies are completely machined" then identifies the engineering and consulting work that resulted in the successful adaptation of the patented gas piston system onto firearms Defendant manufactures, writing:

> We reduced the .500" outside diameter to .437" diameter. They will now clear your hand guard rail without [any] compromise to the integrity. We also moved the shoulder length back to accommodate your long barrel nut. The gas hole on the

KELLY DORSEY, P.C.
10320 Little Patuxent Pkwy, Suite 608
Columbia, Maryland 21044
Tel: (410) 740-8750 • Fax: (443) 542-0069
*www.kellydorseylaw.com*

4

piston base was reduced to .063" diameter to restrict gas for your standard barrel gas hole. We put two .047" diameter gas holes into the gas plug. This will give you a good start for the 5.56 x 45 (16" barrel) and the ability to open them up for shorter barrel lengths.

We removed the gas rings on the scaled down model. This should make manufacturing and cost go down.

Attached are the cad models, prints and pdf's for the piston base and gas plug. You need to replace the ones I gave you while I was out with the attached files.

I will follow up with messaging you the pictures, because of email size.

(*Id.* at 98:12-101:4, Ex. 9.)

The benefits Plaintiff conferred upon Defendant of the engineering support that extended beyond the gas piston system and to Defendant's overall manufacturing processes allow Defendant to manufacture and produce firearms adapted with the patented gas piston system. As Mr. Brown explained at deposition:

> Q: And so now you believe that AMBI is entitled to full payment on amounts identified in the patent purchase agreement as well as the amounts for providing engineering support?
>
> A: I do.
>
> Q: Okay. Why?
>
> A: Why? Because they're using that technology. I gave them the technology on parts that they're running in production today.
>
> Q: Well, how do you know they're running it on production today?
>
> A: Well, believe me, I gave them this stuff and they were working on the machines, having fixtures built. Now, I don't actually know that they're using the stuff to this moment but I do know that I sat down with their machinist, their setup guys. I sat down with Jack and transferred files, tombstones, fixtures, hardware, processes, where to cut, when to cut, what tools to use. They were manufacturing upper receivers at one per every 90-minute, and my process gave them a process to manufacture six in their 90-minute timeframe.
>
> Q: Manufacture what?

5

> A: Upper receivers for the AR-15 and the AR-10.
>
> Q: So this engineering support that you provided was separate and different from engineering support for the gas piston system?
>
> A: That particular was, yes.
>
> Q: And you also provided engineering support for the gas piston system, correct?
>
> A: Yes, sir.
>
> Q: Is any of that included in what you're demanding in this complaint?
>
> A: Yes, sir.

(Exhibit 5, Brown Dep. 120:17-121:21.)

      Indeed, Mr. Kalua confirms Defendant manufactured an AR-15 "rifle that adapted the gas piston [] as of the January 2019 SHOT Show" and was "still testing it." (Ex. 4 at 103:12-104:9.) In addition to the multiple videos that demonstrate Defendant's successful adaptation of the gas piston system to its rifles (*see* AMBI Mot. Summ. J. Exs. 12-18, ECF No. 43-15-21), Defendant produced a report dated April 1, 2019 that details Defendant's continued, successful testing of its own rifles with the adapted gas piston system (the "Test Report"). (*Id.* at Ex. 8, ECF No. 43-11.) The Test Report not only fails to note any problems with the gas piston system itself, but states that "[w]ith the acquisition of the SAC piston system, modifications and design changes to fit the needs of SAC were implemented," (*id.* at Ex. 8 p. 4) and that "[a]ccuracy achieved with the rifle is very promising and will be tested further with a variety of different ammunition. Particularly match grade ammunition." (*Id.* at Ex. 8 p. 8.) The Test Report confirms Defendant used the manufacturing processes, designs, and tools Plaintiff provided to Defendant for its "AR" family of upper receivers to the benefit of adapting the patented gas piston system to Defendant's "M" family of upper receivers. (*Id.* at Ex. 8 p. 4 ("Two rifles were used in this testing, both in the

6

carbine gas length, one 16 [inch] free floated Armalite M15 and one 11.5 [inch] free floated Armalite M15 (endurance testing only).")

Despite Defendant's protestations to the contrary, Plaintiff conferred benefits upon Defendant that allow Defendant to manufacture and produce firearms adapted with the patented gas piston system.

### b. The Benefits Plaintiff Conferred Upon Defendant Exceed $75,000 in Value.

The benefits Plaintiff conferred upon Defendant in the sharing its ideas and intellectual property in connection with the Defendant's use and integration of the Brown Patent into its business and product offerings far exceed the plain value of Plaintiff's engineering and consulting services.

In May 2019, Mr. Kalua voluntarily left the company. (AMBI Mot. Summ. J. Ex. 3, Kalua Dep. 38:3 – 16). At that time, Mr. Kalua was in charge of Defendant's "project" relating to adaptation of the gas piston system. (*Id.* Ex. 6, Schincariol Dep. 91:17 – 19.) Prior to his departure as CEO of Defendant, Mr. Kalua verbally informed Mr. Schincariol that Defendant "*should go into production*" with the patented gas piston system. (Ex. 4, Kalua Dep. 126:2-20) (emphasis added).

Upon Mr. Kalua's departure from Defendant, Mr. Schincariol attempted to get up to speed with the status of the gas piston system project. (AMBI Mot. Summ. J. Ex. 6, Schincariol Dep. 143:2 – 4 (Mr. Kalua "was taking care of business, so that's why, just after he left, I tried to find out what was going on.")). Accordingly, on June 6, 2019, Wanderley Ottoni, Defendant's then Chief Financial Officer, Jack Oliver, Defendant's then Quality Control and Project Development Manager, and Eugene O'Brien, Defendant's then Operations Director, participated in a meeting at Defendant's office wherein they discussed the status of the gas piston system project. By email

7

dated June 7, 2019, Mr. Ottoni circulated minutes of the meeting to, *inter alios*, Mr. Schincariol and his counterparts located in Brazil. (Exhibit 6, Ottoni Dep. 93:19, Ex. 8.)

At his July 29, 2020, deposition, Mr. Ottoni, whom Defendant identified as the corporate designee for matters concerning the "monetary and non-monetary benefits which [Defendant] has received from the [Brown] Patent, [Plaintiff's] provision of engineering and consulting services to [Defendant], and all of [Defendant's] other dealings with [Plaintiff]," (*id.* Ottoni Dep. 18:22-19:7), discussed the "Financial Assessment" of the gas piston system project referenced in the June 6, 2019 meeting minutes.[1]

Mr. Ottoni undertook a "Financial Assessment" of the gas piston project by performing return on investment and payback analyses that included the Defendant firearm "models that were identified by the technical area … that [would] potentially … benefit from [the Brown Patent]", namely, three (3) M-15 models and three (3) AR-10 models. (*Id.* Ottoni Dep. 107:3-109:11; *id.* at Ex. 8 p. 4.) Mr. Ottoni calculated the "estimated benefit" to Defendant as follows (table reproduced here):

---

[1] The June 6, 2019 meeting minutes reference a "Technical Assessment" of the patented gas piston project. (Ex. 6 at Ex. 8 pp. 3-4.) The "Technical Assessment" is refuted by the evidence showing the successful adaptation of the patented gas piston system onto firearms Defendant manufactures. (*See* Section I.a., *supra*.) Additionally, Jason Kalua, Defendant's former Chief Executive Officer, disputes the sum and substance of the issues raised in the "Technical Assessment" portion of the meeting minutes. (*See* Ex. 4, Kalua Dep. 128:7-129:20.)

8

| Estimated Benefit | M15 Family | AR10 Family |
|---|---|---|
| Estimated Selling Price | 1,400 | 1,600 |
| Estimated Cost | (1,000) | (1,200) |
| Gross Profit | 400 | 400 |
| Gross Margin | 28.6% | 25.0% |
| Avg SAC Gross Margin | 20.0% | 20.0% |
| Benefit % | 8.6% | 5.0% |
| Benefit $ | 120 | 80 |
| Reverse Engineering (patent at 2.5 MM $) | | |
| Estimated Volumes | | |
|    Assuming even volumes | 6,250 | 6,250 |

(*Id.* at Ex. 8 p. 5.) Mr. Ottoni confirmed that for each family of firearms the "estimated cost" includes "labor [and] any other cost attached to manufacturing the [firearm] to adapt a piston system…" (*Id.* Ottoni Dep. 110:5-111:4.)

Mr. Ottoni continued:

> Q: And at the end of the day, what does that tell you as far as what the estimated benefit was?
>
> A: We tried to estimate what would be … the potential benefit of future rifle, but then we needed to have the volume in order to say, "Okay: If I'm going to make like $120 per rifle sold in the M15 family and $80 for each rifle sold in the AR10 family," then we need to times this benefit for the expected volumes to be sold in order to get the number necessary to offset the investment made. That is basically a payback.
>
> Q: So if I read your table correct, am I correct in concluding that for every rifle sold – for every M15 rifle sold that adapted the AMBI piston system, that the benefit back to SAC would be 8.6 percent of the sales price?
>
> A: Yep.

(*Id.* Ottoni Dep. 115:21-116:16.)

Mr. Oliver, who also attended the June 6, 2019, meeting, testified concerning the "Timeline" referenced in the meeting minutes. (*Id.* at Ex. 8 p. 6.) Regarding the "CAD/Design Validation" estimated to take five (5) to eight (8) weeks of the manufacturing process, Mr. Oliver explained:

> A: We would have all the drawings. We'd have Al – Al Garcia, our CAD technician – we would have him follow our template for other drawings. We would bring those new components in. He would do all the drawings, 2D and 3D models. Have them tolerated. We'd do tolerance stack analysis against the components. The other components that aren't new that we would want to use in this assembly. And then basically I would review them with him and we'd basically double check each other's work to make sure there was no issues. We'd basically validate were there any other potential issues either in manufacturing or tolerance stack or material selection. Anything like that.

(Exhibit 7, Oliver Dep. 173:4-174:4.) However, Plaintiff performed the requisite "CAD/Design Validation" work as part of the additional engineering and consulting services Defendant requested of Plaintiff, (*see* Ex. 5, Brown Dep. 120:17-121:21), saving Defendant five (5) to eight (8) weeks in its manufacturing process and labor costs associated with Mr. Oliver and Mr. Garcia performing the "CAD/Design Validation" work Mr. Oliver described in his deposition.

The benefits Plaintiff conferred upon Defendants as a result of Defendant requesting, and Plaintiff providing, engineering support and consulting services that encompassed and extended beyond the patented gas piston system disclosed in the Brown Patent to Defendant's overall manufacturing processes allow Defendant to manufacture and produce firearms adapted with the patented gas piston system. Defendant estimates receiving the benefit of 8.6% of the sales price for every M15 family of firearms sold that adapted the patented gas piston system, and 5.0% of the sales price for every AR10 family of firearms sold that adapted the patented gas piston system. While Plaintiff sold its Brown Patent to Defendant, Plaintiff owns all rights to its ideas and

10

intellectual property that are part of the engineering support and consulting services. Plaintiff has effectively licensed those ideas and intellectual property to Defendant.

Yet Defendant claims it has not sold, or even offered for sale, any product incorporating the gas piston system falling within the scope of the Brown Patent. (Ex. 2 at 3.) However, that does not end the unjust enrichment damages inquiry. In Maryland, "[s]ometimes when the unjust enrichment of the defendant cannot otherwise be measured, *the reasonable value of the services received, but not paid for, is the measure of the unjust gain*. In the context of quasi-contract, however, the reasonable value of the services is viewed through the prism of the defendant's gain or enrichment rather than through the prism of the plaintiff's loss. The dollar amount may be the same, but the theory of recovery is different." *Alternatives Unlimited, Inc. v. New Baltimore City Bd. of Sch. Com'rs*, 155 Md. App. 415, 486–87 (2004). (emphasis added). The *Alternatives Unlimited* Court continues: "*[T]he reasonable market value of plaintiff's services* can be viewed as the correct remedy in most quantum meruit cases, even in many cases in unjust enrichment because reasonable value *can be viewed as the defendant's gain in certain situations. The value of the plaintiff's services measures the defendant's gain* when the defendant requests the work: the defendant's benefit is receiving what he or she requested. Those requested services have a market value." *Id.* at 487. (emphasis in original); *see also, Brault Graham, LLC v. Law Offices of Peter G. Angelos, P.C.*, 211 Md.App. 638 (2013).

Plaintiff should receive a reasonable royalty for every firearm Defendant would hypothetically sell that adapts the patented gas piston system; especially given Defendant obtained Plaintiff's trade secrets and know-how related to adapting the gas piston system onto Defendant's firearms and incorporated those trade secrets and know-how into its manufacturing process. *See, AirFacts, Inc. v. de Amezaga*, CV DKC 15-1489, 2020 WL 6874313, at *9-10 (D. Md. Nov. 23,

2020) (When a Plaintiff cannot show damages for misappropriation of a trade secret, the "approach is to measure the value of the secret to the defendant. This is usually the accepted approach where the secret has not been destroyed and where the plaintiff is unable to prove specific injury … In such a case: the 'appropriate measure of damages ... is not what plaintiff lost, but rather the benefits, profits, or advantages gained by the defendant in the use of the trade secret.' … Because the primary concern in most cases is to measure the value to the defendant of what he actually obtained from the plaintiff, the proper measure is to calculate what the parties would have agreed to as a fair price for licensing the defendant to put the trade secret to the use the defendant intended at the time the misappropriation took place.")

In this case, Defendant requested, and Plaintiff provided, engineering and consulting services to adapt the gas piston system onto firearms Defendant manufactures. (*See* Section I.a., *supra*.) Defendant's benefit is receiving what Defendant requested – the ability to adapt the gas piston system onto its firearms. Plaintiff values the requested engineering and consulting services at approximately $222,000.00. (AMBI Mot. Summ. J. Mem. Supp. at 5, ECF No. 43-2.) Defendant presents no evidence to refute the claimed value of Plaintiff's services. Therefore, the benefit Plaintiff conferred upon Defendant greatly exceeds $75,000 in value.

## II. This Court Should Continue to Exercise Supplemental Jurisdiction Over Plaintiff's Unjust Enrichment Claim

Trial courts "enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995). As the *Shanaghan* Court notes: "Among the factors that inform this discretionary determination are convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Id.*; *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n.7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d

720 (1988). Here, convenience and fairness to the parties and considerations of judicial economy compel this Court to continue to exercise supplemental jurisdiction over Plaintiff's unjust enrichment claim. *See* 28 U.S.C. § 1367.

This Court is well-informed of the facts underpinning the dispute between Plaintiff and Defendant. What's more, the parties have engaged in written discovery through the exchange of interrogatories and responses to requests for production of documents. Further, the parties have expended time and resources in taking and defending fact and expert witness depositions. What remains is for this Court to (i) enter a final money judgement in favor of Plaintiff and against Defendant on Plaintiff's breach of contract claim that includes prejudgment interest and assessment of costs; (ii) determine the appropriate award for Plaintiff's attorney's fees under 35 U.S.C.A. § 285 ("The court in exceptional cases may award reasonable attorney fees to the prevailing party."); and (iii) preside over trial on the merits of Plaintiff's unjust enrichment claim – all of which should occur in a relatively short period of time. One the other hand, should this Court remand to state court Plaintiff's unjust enrichment claim, the case will be in a procedural quagmire before the Circuit Court for Baltimore County, Maryland.

For the reasons stated, this Court should continue to exercise supplemental jurisdiction over Plaintiff's unjust enrichment claim.

### III. This Court Retains Subject Matter Jurisdiction to Consider Plaintiff's Claim for Attorney's Fees Under 35 U.S.C.A. § 285.

As a result of the Summary Judgment Order, this Court resolved Plaintiff's breach of contract claim (Count I) insofar as concluding Plaintiff is entitled to a money judgment against Defendant in the remaining principal sum due under the Patent Purchase Agreement in the amount of One Million Four Hundred Thousand and 00/100 Dollars ($1,400,000.00). In its Complaint,

13

Plaintiff also seeks prejudgment interest and attorney's fees. (Second Amended Complaint at 8, ECF No. 42.)

Prejudgment interest is allowable as a matter of right when the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment so that the effect of the debtor's withholding payment was to deprive the creditor of the use of a fixed amount as of a known date. *Ali v. CIT Technology Financing Services, Inc.*, 188 Md.App. 269 (2009), judgment aff'd, 416 Md. 249 (2010). Here, the Patent Purchase Agreement (the "Agreement") provides Defendant will pay "the sum of Two and one half Million Dollars ($2,500,000.00)" in "monthly installments of $100,000.00 USD for 25 months by electronic bank transfer. Payments shall begin in September and be executed on the same day each month." (*See* Patent Purchase Agreement, AMBI Mot. Summ. J. Ex. 2, ECF No. 43-5.) Pursuant to terms of the Agreement, Defendant paid the first installment on September 15, 2008, but failed to pay the monthly installment due August 15, 2019, and the monthly installment due for each month thereafter. (Second Amended Complaint ¶¶ 16-17, ECF No. 42.) Accordingly, as of April 1, 2021, Plaintiff is entitled to prejudgment interest[2] in the amount of $79,944.29.

Once this Court enters final judgment on Plaintiff's breach of contract claim, Plaintiff will file a Motion for an Award of Attorney's Fees (the "Attorney Fee Motion") pursuant to Fed. R. Civ. P. 54(d)(2). The Attorney Fee Motion will, *inter alia*, specify 35 U.S.C.A. § 285 and other grounds entitling Plaintiff to the award. As of the filing of this supplemental brief, Plaintiff will

---

[2] The Maryland Constitution sets the legal rate of interest at six percent per annum, unless the General Assembly provides otherwise. *See* Md.Const. art. III, § 57; *Travel Comm., Inc. v. Pan Am. World Airways, Inc.*, 91 Md. App. 123, 189, 603 A.2d 1301, 1333 (1992).

seek attorney's fees in the amount of no less than $191,127.16.[3] Even if this Court were to remand Plaintiff unjust enrichment claim to state court, this Court would retain subject matter jurisdiction to consider the Attorney Fee Motion. *Samsung Electronics Co., Ltd. V. Rambus, Inc.*, 398 F. Sup. 2d 470 (E.D. Va. 2005). In rejecting defendant's argument that the court lacked jurisdiction to consider the Section 285 fee claim due to mootness of the underlying invalidity claim, the *Samsung* Court held it "retains jurisdiction to 'consider collateral issues after an action is no longer pending.'", *id.* at 482 (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990)). The *Samsung* Court stated certain "covenants not to sue 'do not deprive the Court of jurisdiction to decide Samsung's claim for attorney's fees.'" *Id.* at 483-84.

The continued jurisdiction of this Court to "consider collateral issues" provides further support for this Court to continue to exercise supplemental jurisdiction over Plaintiff's unjust enrichment claim.

## CONCLUSION

Defendant requested Plaintiff provide the engineering and consulting services to adapt the gas piston system onto firearms Defendant manufactures. Plaintiff provided those services by sharing its ideas and intellectual property and providing its time and experience in connection with the Defendant's use and integration of the Brown Patent. Plaintiff conferred benefits upon Defendant that allow Defendant to manufacture and produce firearms adapted with the Brown Patent. Any commercial failure of the Brown Patent is solely the result of Defendant's decision to abandon the gas piston system project and has nothing to do with Plaintiff.

---

[3] The $191,127.16 is reflective of invoicing to Plaintiff from the law firm of Kelly Dorsey, P.C. accounting through December 31, 2020. There are also expert fees and expenses, together with attorney's fees of Plaintiff's patent counsel and continued invoicing by Kelly Dorsey, P.C. through disposition of this case that Plaintiff will seek to recover.

15

For the reasons and evidence provided herein, this Court should retain supplemental jurisdiction over Plaintiff's claim for unjust enrichment.

Respectfully submitted,

KELLY DORSEY, P.C.

Dated: April 1, 2021         By: */s/ Gregory A. Dorsey*
                                 Gregory A. Dorsey (Federal Bar No. 25218)
                                 10320 Little Patuxent Parkway, Suite 608
                                 Columbia, Maryland 21044
                                 Tel: (410) 740-8750; Fax: (443) 542-0069
                                 gdorsey@kellydorseylaw.com

*Attorneys for AMBIMJB, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Supplemental Memorandum was served on April 1, 2021, via the Court's electronic filing system upon:

Steven E. Tiller
stiller@wtplaw.com
Timothy R. Willman
twillman@wtplaw.com
WHITEFORD, TAYLOR & PRESTON, L.L.P.
7 Saint Paul Street, Suite 1500
Baltimore, Maryland 21202
(410) 347-8700

*Attorneys for Strategic Armory Corps, L.L.C.*

                                        */s/ Gregory A. Dorsey*